[Crim. No. 1439. First Appellate District, Division One.—March 22, 1928.]

THE PEOPLE, Respondent, v. JACK LORRAINE, Appellant.

Leo R. Friedman and V. R. Hamilton for Appellant.

U. S. Webb, Attorney-General, and Wm. F. Cleary, Deputy Attorney-General, for Respondent.

KNIGHT, J.—Appellant was convicted of the crime of grand larceny and has appealed from the judgment of conviction and the order denying his motion for a new trial. As grounds for reversal he urges that the trial court erred in ruling upon the admissibility of the evidence and in refusing to give to the jury one of his proposed instructions; that respondent's attorneys were guilty of prejudicial misconduct in arguing certain matters to the jury, and that the evidence is insufficient to support the verdict. Respondent has filed no brief, nor was any oral argument presented in support of the judgment, it being stated on behalf of respondent at the time the appeal came on for hearing before this court that the contentions made in appellant's brief were deemed unanswerable. We have nevertheless carefully examined the record on appeal, including the transcript of the evidence, and have also fully considered the contentions made in appellant's brief, and in our opinion the points appellant urges are without sufficient merit to demand a reversal of the judgment.

The record discloses that appellant was indicted by the grand jury of the city and county of San Francisco, jointly with Emma Brose and Fred Brose, her husband, upon a charge of stealing from Eva M. Fleming six diamond rings of the total value of $16,000, but that owing to appellant's disappearance following the alleged theft, Brose and his wife were tried first, with the result that the jury acquitted Brose and

convicted his wife. Upon appeal, division two of this court, on March 31, 1927, affirmed the judgment of conviction (*People* v. *Brose*, 82 Cal. App. 126 [255 Pac. 233]), and thereafter a petition for a hearing before the supreme court was denied. The evidence establishing the guilt of the defendant in that case, so far as it is set forth in the opinion, appears to be substantially the same as the evidence upon which the verdict of guilty in the present case was founded, and there, as here, the question of the insufficiency of the evidence was urged as one of the grounds for reversal. It would seem, therefore, at the outset, that the affirmance in that case definitely disposes of appellant's contention here that the evidence does not support the verdict, and would make it unnecessary to again narrate the evidence and consider the question of its sufficiency here. However, in addition to the facts set forth in the opinion in *People* v. *Brose, supra,* the reporter's transcript in the present case discloses proof of a number of circumstances tending strongly to establish appellant's guilt. For that reason and in view of the charge of conspiracy, and in order to readily understand appellant's legal contentions, it would seem necessary that the facts appearing in the record before us be stated somewhat fully.

Summarizing, the evidence shows without dispute that Miss Fleming's rings were stolen from her fingers on the night of October 27, 1925, in appellant's apartments, while she lay in a stupor caused by either drugs or intoxicants or both, after having participated in a dinner party given therein by appellant and others; and in our opinion the circumstances established by the prosecution clearly justify the conclusion that said apartments were rented by appellant and the dinner party arranged therein for the very purpose of executing this crime, and that appellant was an active participant therein. The principal facts supporting the foregoing conclusion, as the same are shown by the evidence, are as follows: Miss Fleming was engaged in the insurance business in San Francisco and was in the habit of wearing said jewelry almost constantly. She had known Brose and his wife for some time prior to the year 1925, having made their acquaintance in the pursuit of her business. She was also acquainted with members of Mrs. Brose's family and with others living in the same house. The acquaintanceship

between the two became quite friendly in a social way, Miss Fleming having attended several social affairs at Mrs. Brose's invitation, during which more or less intoxicating liquor was served. Mrs. Brose had invited Miss Fleming to a dinner to be held at the former's home in the Richmond District, San Francisco, on September 26, 1925, but upon learning that she would be unable to attend, Miss Fleming called early in the afternoon of that day to inform Mrs. Brose of that fact, at which time she met appellant. He was introduced to her by Mrs. Brose as Jack Barr, although at that time Mrs. Brose knew that his name was Lorraine, having known him since 1919 and formerly been in his employ. After completing her call Miss Fleming was driven to her office downtown by Brose and appellant; and, notwithstanding that for many years appellant had resided in San Francisco, he carried on a conversation with Miss Fleming, while en route to her office, in which he represented himself as being a resident of Chicago, and intimated that he intended to take out additional insurance.

Miss Fleming met appellant socially in company with Brose and his wife on three subsequent occasions, each meeting having been brought about by Mrs. Brose. The first one took place at Mrs. Brose's home on October 3d; another shortly afterwards at a downtown hotel, and the third at the Braeburn Apartments on October 26th, the night before the theft of the jewels. With reference to the occasion last mentioned the evidence shows that Mrs. Brose invited Miss Fleming to a dinner party to be held at said apartments that night, but Miss Fleming did not accept. About 8:30 the same night Mrs. Brose phoned Miss Fleming at her hotel, again inviting her to the Braeburn, and in response Miss Fleming went there, arriving about nine o'clock and remaining until after midnight, and then returned to her hotel. Present on that occasion besides appellant, Brose and his wife, were a Mrs. Jones, who at that time was known to Miss Fleming only as Rachel, and a man referred to by those present as "Red" Rafferty, and to whom Miss Fleming had been introduced by Mrs. Brose at one of the previous gatherings. It was represented that Mrs. Jones had just taken the apartment at the Braeburn, and during the course of the evening Mrs. Brose, after expressing regrets that Miss Fleming was not able to join them at dinner, per-

suaded her to accept an invitation to dine there the next night, explaining that they did not have much privacy at their own home on account of others living in the same house with them, and that they were down at the apartment "for a lark." The fact was that the apartment had not been rented by Mrs. Jones, but had been engaged and paid for by appellant two nights before, for a week, under the fictitious name of Lorry.

In response to this invitation Miss Fleming arrived at the apartment early the next evening and about 7 o'clock dinner was served, at which were present besides Miss Fleming, the appellant, Brose and his wife, "Red" Rafferty, and a young woman they addressed as Myrtle. Rachel Jones was absent. The testimony given by Miss Fleming as to what afterwards happened was in substance as follows: Before dinner was served she was offered intoxicating drinks, but declined because she did not like the kind of liquor Mrs. Brose had given her at the apartment the night before, and she asked for and was given what she believed was a glass of ginger ale. During the dinner she was also served with a cup of coffee, but did not drink all of it, because she did not like the taste of it. After dinner she assisted Mrs. Brose in washing and drying the dishes, and while doing so began to feel distressed, being "short of breath" as she expressed it. After the dishes had been put away Mrs. Brose suggested a game of cards, but not feeling well, Miss Fleming did not join in playing. During the progress of the game another round of drinks was served, but Miss Fleming again called for ginger ale. Soon after taking this last drink she felt "very miserable" and went into the living-room adjoining to recline on the couch where she was served with another drink of what she took to be ginger ale. Soon afterwards she lapsed into a state of unconsciousness, and when she regained her senses she was still reclining on the couch and Mrs. Brose and Myrtle were standing in front of her. Mrs. Brose immediately told her that the apartment had been robbed. Appellant at that time was in the dining-room adjoining, the two rooms being connected by an open archway. Miss Fleming asked how the apartment could have been robbed while Mrs. Brose and the rest of them were there, and she was told that after she had gone to sleep they all left the apartment and went to the beach to get

something to eat, and that the robbery had taken place during their absence. Miss Fleming immediately looked at her hands and discovered that all of her rings had been stolen from her fingers, and she noticed also that the crystal of her wrist watch was broken and the catch loosened, but that her watch was still running, indicating that it was 9:30 o'clock. Looking down at the floor she saw a bar pin which had been removed from her dress. She instantly declared she would phone to the clerk of the apartments and also to the police, but appellant emphatically told her that she "would do nothing of the kind," that his reputation was at stake, or words to that effect, and that he would "not have any excitement" about the matter. Myrtle stated that if the robbery was made public she would lose her job, and Brose declared he would likewise lose his position. Rafferty said nothing. All assured Miss Fleming, however, that if she would only keep quiet they "would get their heads together and find some good way" to locate her stolen jewels and have them returned to her. They also informed Miss Fleming that the robbers had taken a bracelet, a necklace and two rings belonging to Mrs. Brose, a watch and wallet containing over $100 belonging to appellant, and a watch belonging to "Red" Rafferty. The evidence shows without dispute that there were no indications whatever of a breaking into the apartment. The door was fastened with a spring lock, and Mrs. Brose admitted that she locked the same when they departed for the beach, and that it was found securely locked upon her return. Miss Fleming further testified that after regaining consciousness she was detained in the apartment against her will by the Broses and appellant the rest of the night and until the next evening; that at different times during the night she attempted to phone to the police and to friends, also to leave the apartment, but that she was forbidden from doing so by appellant and forcibly restrained by Mrs. Brose; also that on one occasion she raised the window in the apartment, but that Mrs. Brose immediately closed it. Toward evening Miss Fleming insisted on leaving the apartment, whereupon the Broses, appellant, and Rafferty consented to drive her to her hotel in the Brose machine, but after she entered the car they started to take her for a ride to the beach. She insisted on being driven to the hotel, however, and on the way there Mrs. Brose threatened

to sue her if she made public the robbery, and appellant declared: "If you say anything about this and it hurts my splendid reputation you will have all the publicity that a woman can possibly be given. You will be ruined." She was let out of the machine a short distance from the hotel. Soon after entering her hotel Miss Fleming communicated with friends and a private detective was called in. Later on, about 1 o'clock that night, they went to police headquarters and reported the robbery. A search was immediately made by police detectives, accompanied by Miss Fleming, for the Broses and appellant, and although the search continued until 6 o'clock in the morning no trace of them could be found. The apartment had been given up by appellant and his belongings removed soon after Miss Fleming had been taken to her hotel; and when he checked out the clerk suggested to him that the week for which he had paid in advance was not up; nevertheless, he paid the additional incidental expenses and departed. Later on that same night Brose and his wife, appellant, and Rafferty went to Oakland by automobile, leaving San Francisco about midnight. They remained there until morning; and after having breakfast together appellant disappeared, and Brose and his wife returned to San Francisco and took an apartment at a hotel under the fictitious name of Clem. They remained there until November 3, 1925, when they surrendered to the police. As to what became of appellant, the evidence does not reveal, but he was not placed on trial until approximately two years after the theft was committed, and it may be reasonably inferred from the circumstances proved that the delay was caused by his disappearance.

Further evidence was offered by the prosecution to prove that between 9 and 10 o'clock on the morning of October 29th, which was the second day after the theft, Miss Fleming consulted a doctor on account of pain she was suffering from a small bruise on each shoulder. The doctor testified that in his opinion these bruises were caused by the insertion of a hypodermic needle; also that from the description given of Miss Fleming's symptoms her unconscious condition had been produced by chloral. It was also shown that notwithstanding other members of the dinner party claimed to have been victims of the robbery, no report was ever made by any of them to the police, nor did appellant even mention

the matter to the clerk of the Braeburn when he checked out.

Appellant did not offer himself as a witness at the trial, nor were any of the others present at the dinner party called upon to testify except Mrs. Brose, who was produced as a witness first by the prosecution and afterward by the defense; and it was upon her testimony that appellant mainly relied to establish his innocence, she having denied taking any of Miss Fleming's jewelry herself or of seeing anyone else take the same, claiming that the robbery occurred during the absence of herself and the others from the apartment. Appellant furthermore endeavored to prove on cross-examination of Mrs. Brose and Miss Fleming that the latter's unconscious condition was caused by a voluntary overindulgence in intoxicants; but it would seem to make little difference whether she was drugged or intoxicated, for, irrespective of the exact cause of her condition, her jewelry was admittedly stolen from her while she was in a helpless state; and the fact, therefore, that she may have been intoxicated and not drugged would have no tendency to prove either that the robbery was not committed or that appellant was not a participant therein. Appellant also attempted to show in the same manner that Miss Fleming was not detained in the apartment against her will nor prevented from communicating with friends or the police, but that, on the contrary, she continued to drink and remained intoxicated during the rest of the night and most of the next day, which was the real reason for remaining in the apartment until the evening following the dinner; and in this connection the clerk at Miss Fleming's hotel testified that on the morning after the robbery a man whose identity was not disclosed phoned to him saying that Miss Fleming desired to see him at the Braeburn Apartments, but that he declined to go there. In explanation of this latter testimony Miss Fleming testified that she tried to phone to the clerk herself, but was forcibly restrained from doing so; and with reference to the charge of intoxication she consistently denied that such was the fact. The jury, whose exclusive province it was to determine the truth of the matter, doubtless believed her, and we have found nothing inherently improbable in her testimony. Therefore, so far as the question of appellant's guilt is concerned, there are no grounds

upon which we may legally set aside the jury's conclusions; and unless such error was committed in the trial of the action as deprived appellant of a fair trial the judgment must be affirmed.

With reference to the admissibility of evidence, appellant relies upon but one assignment of error. It relates to the testimony of Mrs. Brose, while testifying as a witness for the People, to the effect that after separating from appellant in Oakland she and her husband, upon their return to San Francisco, engaged a hotel apartment under an assumed name. The testimony in question was as follows: "Mr. Garry (assistant district attorney): Q. Where did you go? A. To the Ogden Hotel on Mission street. Q. By 'we' you mean you and your husband? A. Yes sir. Q. Did— Were you registered there at the Ogden Hotel? A. We were. Q. Under what name?" The question was objected to by counsel for appellant upon the ground that the testimony sought to be elicited was incompetent, irrelevant and immaterial, not part of the *res gestae*. The objection was overruled, and the witness answered: I think, if I remember right, I think it was the name of Clem." Continuing, the testimony was as follows: "Mr. Garry: Q. That would be on the morning of October 29th, would it not? A. I know it was on Thursday morning. What date it was I don't remember. Q. Well, that would be the second day after the dinner at the Braeburn Apartments? A. Yes sir. Q. And how long did you remain there? A. Until the following Tuesday. Q. Until the following Tuesday. That would be November 3d, would it not? A. Election day, yes sir. Q. And on that day you surrendered to the police, did you not? A. We did."

In support of his objections appellant contends that if a conspiracy did exist between appellant and others, including Mrs. Brose, to steal Miss Fleming's jewelry the object thereof was accomplished on the night of October 27th between the hours of 8:30 and 11:30 o'clock; or if it be assumed that such conspiracy continued for any purpose thereafter it was terminated when the Broses and appellant separated in Oakland; and that in either event the evidence called for by the question objected to related to an act of a co-conspirator committed after the termination of the conspiracy and therefore was inadmissible.

██ The rule relating to the admissibility of the acts and declarations of co-conspirators is well settled, and is to the effect that where an unlawful enterprise is established between two or more persons, either by direct or circumstantial evidence, every act or declaration of each member of the confederacy in pursuance of the original concerted plan and with reference to the common object is, in contemplation of law, the act and declaration of them all, and is therefore original evidence against each of them; and that everyone who thus enters into a common purpose or design is generally deemed in law a party to every act which had before been done by the others and a party to every act which may afterward be done by any of the others in furtherance of such common design. ██ But, the authorities hold, care must be taken that the acts and declarations thus admitted be those only which were made and done during the pendency of the criminal enterprise and in furtherance of its objects (1 Greenleaf on Evidence, 16th ed., p. 305); and whenever it appears that the objective of a conspiracy in which several persons participate is at an end, the subsequent acts and admissions of co-conspirators are not admissible against the·others. (*People* v. *Oldham,* 111 Cal. 648 [44 Pac. 312].)

██ The common design of a criminal enterprise may extend, however, as appellant concedes, beyond the point of the commission of the act constituting the crime for which the alleged conspirator is on trial (*People* v. *Opie,* 123 Cal. 294 [55 Pac. 989]; *People* v. *Mazzurco,* 49 Cal. App. 275 [193 Pac. 164]; *People* v. *Holmes,* 118 Cal. 444 [50 Pac. 675]; *People* v. *Rodley,* 131 Cal. 240 [63 Pac. 351]); and, as declared in California Jurisprudence (vol. 5, p. 523), "The question as to when the design is accomplished and abandoned is one depending on the facts and circumstances of each case, and the nature and purposes of the conspiracy; and such question is one for the jury, as is also the question as to whether the acts proven were not a part of the design of the conspiracy" (citing *People* v. *Holmes, supra; People* v. *Mazzurco, supra; People* v. *Rodley, supra*). In other words, whether or not the subsequent act committed is the ordinary and probable effect of the common design or whether it is "a fresh and independent product of the mind of one of the conspirators, outside of, or foreign

to, the common design, is a question of fact for the jury (*Bowers* v. *State,* 24 Tex. App. 542 [5 Am. St. Rep. 901, 7 S. W. 247]; *Spies* v. *People,* 122 Ill. 1, 642 [3 Am. St. Rep. 320, 12 N. E. 863, 17 N. E. 898]), and if there be any evidence to support the finding of the jury on this question its determination is conclusive." (*People* v. *Kauffman,* 152 Cal. 331 [92 Pac. 861]; see, also, *People* v. *Bringhurst,* 192 Cal. 748 [221 Pac. 897].)

In the present case, as above shown, the prosecution proved that immediately after driving Miss Fleming to her hotel the apartment wherein the robbery occurred was given up, and shortly after midnight that same night the alleged conspirators under unusual circumstances departed in an automobile for Oakland, and that within a few hours thereafter appellant disappeared and the Broses returned immediately to San Francisco and engaged apartments under an assumed name. The reasonable inference to be drawn from the foregoing evidence is that all of these subsequent acts were consummated in execution of a scheme to evade arrest and escape punishment, and, therefore, under the rule of the authorities cited, the trial court was justified, we think, in receiving the evidence in order that the jury might determine whether or not the original conspiracy extended up to and included the scheme to escape, and if so, whether the act of the Broses in registering under an assumed name was in pursuance thereof.

In this particular the present case does not differ materially from *People* v. *Rodley, supra.* There the charge was perjury for having given false testimony in connection with the probate of a will. The prosecution was allowed to prove that subsequent to the giving of the false testimony the matter was investigated by the grand jury and that a Mrs. Houseworth, who was the beneficiary named in the spurious document offered for probate and an accomplice in the crime of perjury for which Rodley was on trial, sought to induce a witness named Swearingen not to testify before the grand jury as to certain facts of which he was cognizant. Rodley sought to have the testimony excluded upon the ground that it was the act of a co-conspirator committed subsequent to the commission of the crime of perjury; but the supreme court said: "The object of the conspiracy was to 'loot' the estate of the deceased Fuller; the perjury of de-

fendant and others in the probate proceeding was only one step to this end. It had been necessary before this to fabricate a will, and *it was still necessary for the conspirators to avoid detection, keep themselves out of the state prison,* and keep up the deception that they were practicing on the probate court, in order to realize anything from their crimes; and it was with these ends in view, no doubt, that Mrs. Houseworth approached Swearingen on the subject of his testimony before the grand jury. We think, therefore, that what she said and did in that connection was in furtherance of the purpose of the conspiracy, and does not come within those cases which exclude the acts and declarations of one conspirator, done and made after the 'common criminal design' is accomplished or abandoned, as against his coconspirator." (Italics ours.)

And so here, if, as the jury decided by its verdict, the parties conspired to rob Miss Fleming, the obtaining possession of the jewelry was only one step in the execution of the enterprise, and it was still necessary to the successful consummation thereof that the parties to the conspiracy evade arrest. It is reasonable to believe, therefore, that any attempt by them to do so was part of the original design.

In support of his position regarding the point under discussion, appellant cites several California cases, all of which adhere to the fundamental rule against the admission of declarations and acts of a co-conspirator not made and done in furtherance of the common purpose. The restatement of the rule in the forepart of this opinion is an assurance that we do not presume to question its soundness; but, as has been well said, controversy usually arises with reference to its application to the circumstances of the individual case, and for that reason the decision in one case is usually of little value as a precedent in another. (1 Greenl. on Ev., p. 305, n. 2.) Looking to the facts of the cases appellant cites, we find them to be materially different from those of the one before us.

The last four cases cited by him (*People* v. *Oldham, supra, People* v. *Ayhens,* 16 Cal. App. 618 [117 Pac. 789], *People* v. *Smith,* 151 Cal. 619 [91 Pac. 511], and *People* v. *Collum,* 122 Cal. 186 [54 Pac. 598]), all involved testimony given by persons not parties to the conspiracy as to *declarations* of coconspirators made manifestly after the conspiracies had

ended; and it may be conceded that the admission of such testimony clearly violates the hearsay rule that it is "never competent to use as evidence against one on trial for an alleged crime the statements of an accomplice not given as testimony in the case nor made in the presence of the defendant nor during the pendency of the criminal enterprise and in furtherance of its objects." (*People* v. *Moore*, 45 Cal. 19.) But the application of the hearsay rule does not concern us here, for no question of declarations is presented. Our problem involves the testimony given by an alleged co-conspirator herself as to an act of hers, done under circumstances bearing the reasonable inference that it was a part and in furtherance of the original common design. It will, therefore, be seen that the four cases mentioned do not touch the point at issue.

In *People* v. *Irwin*, 77 Cal. 494 [20 Pac. 56], the judgment of reversal was based on several grounds, the opening sentence of the opinion reading: "The record herein bristles all over with errors." One of the points urged, however, was that the court instructed the jury that "falsehood, evasion, and silence" of a co-conspirator not on trial, when questioned after the crime had been committed, should be considered by the jury "as tending in some measure to establish the fact of a criminal conspiracy as charged." In holding the instruction to be erroneous, the court pointed out that the evidence proved "beyond controversy" that the only conspiracy, if any existed, to which the defendant was a party, ended before the declarations in question were made, and declared that "No falsehood, evasion, or silence" of a co-conspirator, occurring after the deceased was killed, was admissible in evidence against the defendant under any circumstances, and in any event, the evidence was inadmissible to establish the existence of the conspiracy. In the case at bar Mrs. Brose was not interrogated subsequent to the alleged theft, and consequently no question of her declarations or demeanor under such circumstances has arisen.

In *People* v. *Opie, supra,* the testimony related to the "appearance, conduct, and declarations" of a co-conspirator not on trial, apparently upon being questioned after the crime had been committed. Obviously, such testimony was inadmissible under the "falsehood, evasion, and silence" rule announced in *People* v. *Irwin, supra.* True, the prosecution,

on appeal, sought to justify the admission of the testimony upon the theory that the conspiracy had not ended at the time such "appearance, conduct, and declarations" were observed, the prosecution claiming that the stolen property had not yet been divided; but answering this contention, the court pointed out that there was no evidence whatever in the record disclosing that the property had not been divided or that there was any intention that it should be divided; and it was held, therefore, that there was no evidence introduced (as there was here) tending to show a continuation of the conspiracy after the commission of the crime.

The manner in which appellant presents and discusses the case of *People* v. *Lee Chuck*, 78 Cal. 317 [20 Pac. 719], upon which he strongly relies, is somewhat confusing. There the defendant was on trial for murder, and the prosecution introduced evidence showing that four other Chinamen were present at and participated in the killing. The defense sought to prove an alibi for two, and to show that the others, including Lee Chuck, killed the deceased in self-defense. Among the other points urged on appeal were two rulings relating to two distinct matters of fact. The principal ruling pertained to testimony showing the absence at the trial of three of the accused Chinamen. In connection therewith the prosecution was allowed to prove over defendant's objection that, although diligent effort had been made to serve warrants of arrest upon the absentees, they could not be found. This evidence was admitted upon the theory advanced by the prosecution that the failure of the absentees to be present at the trial to explain what occurred at the time of the shooting was a circumstance to be taken against the defendant on trial, tending to show that the homicide was not committed in self-defense as claimed. In holding the admission of the testimony to be error, the supreme court said: "There is nothing to show that the defendant was in any way responsible for their absence, or that he was not as desirous that they should be present as the prosecution. This is to permit the act or conduct of one party, after a crime is claimed to have been committed, indicating his guilt, to be proved against another *in no way connected with such act or conduct*. We are wholly unable to see upon what rule of law or justice such a rule can be upheld." (Italics ours.) And after discussing at some

length the analogy of a New York case, the court held: "Having gone to the jury for that purpose, its injurious effect on the rights of the defendant must be apparent. We hold that this was fatal error for which a new trial should have been granted." The facts upon which the foregoing ruling was based are not referred to in appellant's brief. The other state of facts, involving the second ruling, is the one to which appellant does call our attention. With respect thereto the evidence shows that several hours after the shooting, a police officer arrested the fourth accused Chinaman, not on trial, in a small "cubby hole" at the top of a building near the place of the shooting, which the officer was allowed to describe with the view of proving that the Chinaman was hiding there to avoid arrest. The district attorney claimed that the evidence was competent to disprove any alibi which the defendant might attempt to assert. In passing upon this particular point the court merely said: "We are quite clear that it was not competent for that purpose. There is nothing to show that his whereabouts tended in any way to establish the presence of the defendant at the place of the killing and it appeared that the time to which the testimony referred was several hours after the homicide occurred. It was error to admit the evidence." As above indicated, appellant refers only to the facts relating to the Chinaman being concealed in the "cubby hole," but in his brief he has mistakenly applied to those facts the "fatal error" language employed by the supreme court in holding to be reversible error the admission of the evidence relating to the absentees. Moreover, and aside from the differentiating facts above mentioned, the Lee Chuck case cannot be said to be decisive of the point here involved, for neither the absence from the trial of some of the accused, nor the fact that the other was concealed in the "cubby hole," was in any way connected with the activities of the defendant on trial, nor did the circumstances tend to show, as they did here, that the acts complained of were the result of a preconceived scheme to which the defendant on trial was a party.

In *People* v. *Stanley,* 47 Cal. 113 [17 Am. Rep. 401], the remaining case cited by appellant, the defendant was indicted for robbery, jointly with three others, named Collins, McGovern, and Smith. Stanley was tried separately and con-

victed, and on appeal the judgment was reversed on a ruling of the trial court admitting evidence introduced by the prosecution to the effect that immediately after the robbery the parties charged were arrested and while being conducted to the jail, McGovern broke away from the officer and attempted to escape, but after a chase was recaptured. The decision therein is of little or no value as a precedent, however, because the court qualified its decision by adding: "If all the evidence was before us it might be apparent that the admission of the testimony could not possibly have prejudiced the defendant. But, in the absence of the evidence, it is impossible for us to determine that it could not; and the rule is that every error in the admission of testimony is presumed to be injurious, unless the contrary clearly appears." Afterward the same testimony was introduced over the defendant's objection in the companion case of *People* v. *Collins,* 48 Cal. 277, which is not cited by appellant, and a reversal of the judgment of conviction was urged therein upon the authority of *People* v. *Stanley, supra;* but the supreme court ruled adversely upon the point, saying that the entire record of the evidence was then before it, from which it appeared that the testimony was admissible for the purpose of showing that McGovern had the opportunity after his arrest to dispose of the fruits of the robbery without detection; and the judgment in the Collins case was accordingly affirmed. It will be seen, therefore, that the reversal in *People* v. *Stanley* was the result, merely, of the failure of the prosecution to bring before the supreme court on appeal the entire record of the evidence. In the present case, pursuant to the modern method of appeal, the entire transcript of the evidence is before us. Also, it will be noted that in neither of the cases last cited was it claimed that the attempted flight of McGovern was the result of a concerted plan, or otherwise connected with the defendant on trial.

Assuming, however, for the purpose of discussion, that there is some remote analogy in fact or principle between the case at bar and the Lee Chuck and Stanley cases, it is evident that the latter are not to be taken as decisive of the present appeal, because the judgments of reversal therein were rendered during that period of time when it was the established law of this state that error being shown in the

admission of testimony was presumed to be prejudicial unless the contrary clearly appeared. Since then, as is well known, an important change has been made in the state constitution which effectually abrogated the rule theretofore governing appeals; and in the present state of the law, injury must affirmatively appear to the reviewing court, after an examination of the entire cause, including the evidence, and from the nature of the error itself, before a judgment of conviction will be reversed (*People* v. *Watts*, 198 Cal. 776 [247 Pac. 884]) ; and the burden of showing such prejudicial tendency of error is upon appellant. (8 Cal. Jur., p. 601.) ■ Viewed, therefore, in the light of the rule now prevailing, it cannot be said with any degree of assurance that the act of the Broses in registering at a hotel in San Francisco under an assumed name operated prejudicially against appellant, for if it be deemed indicative of guilt at all, it related only to themselves and, standing alone, had no tendency to inculpate appellant in the theft of the jewels. Even though it be assumed, therefore, that error was committed in admitting the testimony, it would not constitute ground for reversal, for, as held in *People* v. *Stokes,* 5 Cal. App. 205 [89 Pac. 997], evidence of the acts of a co-conspirator after the accomplishment of the purpose of the conspiracy, even though incompetent and erroneously admitted, is harmless if those acts throw no light upon the issue as to whether the alleged conspirator on trial was a participant in the commission of the crime.

■ Appellant's next point is that the court erroneously refused to give an instruction proposed by him, relating to the witness Mrs. Brose. It reads as follows: "There has been testimony introduced in this case to the effect that (a) witness for the prosecution has previously been convicted of a felony and that such felony was for the same offense for which the defendant is here on trial. *You are instructed that such evidence was only admitted for a special purpose, that is, for purposes of impeachment of such witness and cannot be considered by you for any other purpose.* The defendant in this action must be tried by you solely upon the evidence introduced in this case, and in determining the guilt or innocence of the defendant the fact that some other person has been previously convicted of the same offense cannot be considered by you as a fact in any way

bearing upon the guilt of Jack Lorraine." (Italics ours.) The testimony referred to in the instruction was elicited by appellant from Mrs. Brose at the close of her cross-examination, and was as follows: "Mr. Friedman (Counsel for appellant): Q. Mrs. Brose, unfortunately you have been tried for this offense, have you not? A. Pardon me? I didn't hear you. Q. I say you have been tried for the stealing of these jewels? A. I have. Q. Your husband was likewise tried with you? A. He was. Q. He was acquitted, was he not? A. He was. Q. And you were convicted? A. I was. Mr. Friedman: That is all."

 Where a requested instruction is erroneous in part in its statement of the law it may be rejected as a whole. (*People* v. *Metzler*, 21 Cal. App. 80 [130 Pac. 1192]; *People* v. *Davis*, 64 Cal. 440 [1 Pac. 889]; *People* v. *Walters*, 98 Cal. 138 [32 Pac. 864].) In the present case that portion of the proposed instruction above italicized was manifestly erroneous, for the record clearly demonstrates that the fact of Mrs. Brose's conviction was not elicited by appellant, nor admitted by the court for the purposes of impeachment or to discredit her as a witness. On the contrary, it shows that throughout the trial appellant relied almost entirely upon her testimony to establish his innocence; and on this appeal he has consistently endeavored to sustain the verity of her testimony, particularly with reference to what happened on the night of the robbery and the day following. In fact, she was the only one present at the dinner party to testify at this trial in refutation of Miss Fleming's charges, and appellant afterward called her as a witness in his own behalf, thus vouching for her credibility. Moreover, it will be noted that at the time appellant revealed the fact of Mrs. Brose's conviction he proved also that her husband had been acquitted, which would fairly indicate, we think, that the ostensible purpose of the cross-examination on this point was not to impeach or discredit Mrs. Brose as a witness, but to show that if Miss Fleming's jewelry was stolen, a jury had already fastened the guilt upon Mrs. Brose alone.

The numerous cases cited by appellant in support of his last point merely adhere to the settled rule that any affirmative evidence offered, either by the prosecution or the defense, to show the conviction or acquittal of another person of the crime for which the defendant is on trial is incompetent; and in those cases where such testimony was intro-

duced by the prosecution over the defendant's objection, it was held to be error. Here the testimony was elicited by appellant, and therefore he is not in a position to complain of its effect.

Nor do we find any merit in appellant's final contention that the prosecuting attorneys were guilty of prejudicial misconduct in their arguments to the jury. As pointed out, the testimony of Mrs. Brose as to her conviction was not offered or admitted for any limited purpose, and being brought out by appellant, the prosecuting attorneys were entitled to comment upon it for what it was worth. As to the reference made by said attorneys regarding appellant's disappearance, it has long since been the rule that flight of a person accused of crime may be considered as a circumstance indicative of guilt. The circumstances surrounding appellant's disappearance fairly justify the inference that he fled after the separation in Oakland. Argument on the point was therefore legitimate. The third claim of misconduct has reference to the comments made by respondent's attorneys in relation to the act of the Broses in registering at the hotel under an assumed name. Appellant concedes, however, that he offered no objection to this line of argument at the time it was being made, nor did he assign the same as misconduct; consequently, under the well-established rule his objection for the first time on appeal comes too late.

After reviewing the entire record, including the transcript of the evidence, we do not find that any error has been committed in the trial of the action which has deprived appellant of the fair trial to which he is entitled, nor do we believe that the verdict has resulted in a miscarriage of justice; consequently, we are without authority to disturb the jury's finding. The judgment and order appealed from are therefore affirmed.

Tyler, P. J., and Parker, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on April 21, 1928, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 21, 1928.

All the Justices concurred.