[Crim. No. 3411. Second Appellate District, Division One.—March 12, 1941.]

THE PEOPLE, Respondent, v. WARREN SUTER, Appellant.

A. H. McConnell for Appellant.

Earl Warren, Attorney General, and Lewis Drucker, Deputy Attorney General, for Respondent.

WHITE, J.—In an indictment returned by the grand jury, defendants were accused in count 1 of the offense of conspiracy to commit the crime of corruptly offering and giving a bribe, in violation of section 165 of the Penal Code, while counts 2, 3, 4 and 5 respectively charged violations of the same Penal Code section. Count 2 was subsequently dismissed on motion of the district attorney.

Upon a trial by jury appellant was found guilty of the offenses charged in counts 1 and 4 and was acquitted of the crimes alleged in counts 3 and 5 of the indictment. Following denial of his motion for a new trial and the pronouncement of judgment against him, appellant prosecutes this appeal from both the judgments and the order denying him a new trial.

The story of the alleged conspiracy which forms the basis of this prosecution is reflected in the testimony of Robert Ramsey, a defendant and coconspirator, against whom the case was dismissed pursuant to the provisions of section 1099 of the Penal Code. Ramsey was a cafe owner, and in conjunction with the conduct of his cafe he accepted wagers upon horse races and phoned them in to appellant, Suter, who was a bookmaker. Just prior to the election of a city council in the city of Long Beach in May, 1939, defendant Julius B. Lorge, a Long Beach city police officer, approached Ramsey, telling him that if a new council were elected it might be possible to get a new police administration. Following the election, Officer Lorge had another conversation with Ramsey, in which he said, "We want to get Cy Wright in as chief of police," and further stated that Mr. Wright was a "right guy" and would be liberal so far as bookmaking was concerned. A few days thereafter, Lorge asked Ramsey if the latter could get some money to bring about Wright's appointment, and Ramsey told the officer that he would see

what he could do. Immediately thereafter he communicated with appellant Suter and asked the latter if he would be interested in putting up some money to get the right chief of police into office. Appellant wanted to know who was behind it, and Ramsey told him Officer Lorge was. Thereupon Ramsey introduced appellant to Lorge. A few days later appellant told Ramsey that he had given Officer Lorge $3,000 and that he would go through with the deal. During the month of August, 1939, Ramsey went to the apartment of the defendant Olive Wurster in response to a telephone call from her, and there met with her and Lorge. Prior to this meeting Lorge had informed Ramsey that there was a woman who was very influential, so far as politics was concerned, in the city of Long Beach, and who in his opinion could do a great deal of good toward getting Mr. Wright appointed chief of police. At this same meeting Mrs. Wurster said she would have to have at least $2,000 in order to make any headway and to convince her ''contacts'' that it was not all ''hot air''. Lorge then asked Ramsey what remuneration they would get from the bookmakers for protection, and Ramsey replied that he expected about 25 per cent of the net, that being the usual procedure. Mrs. Wurster suggested that it would be better if $5,000 could be obtained for delivery to the councilmen who were required to confirm the city manager's appointment to the office of chief of police. A couple of days later Ramsey asked appellant Suter for $2,000 to be delivered to the other parties in connection with the effort to secure the appointment of such chief of police. Suter informed Ramsey he would get the money, and thereafter did give $2,000 to Ramsey, who in turn delivered the money to Lorge with instructions to pass it on to Mrs. Wurster. Later Ramsey phoned appellant that Mr. Lorge had taken the money and that it was delivered. During the month of August, 1939, Ramsey met with Lorge and Mrs. Wurster and inquired of the latter how she was making out with her contacts, to which she replied, ''Very well''; that she had seen one city councilman, who indicated an interest in voting for Mr. Wright in consideration of receiving $1,000. This information, Ramsey testified, he conveyed to appellant. About a week or ten days thereafter, Mrs. Wurster told Ramsey that she had seen two more city councilmen who were agreeable to voting for the confirmation of Mr. Wright as chief of police in consideration of the payment of $1,000 to each of them.

During September appellant communicated with Ramsey and requested a return of the $2,000, which request was complied with. A week or ten days later Mrs. Wurster communicated with Ramsey, stating that she must have the money back again, as she could not do anything without it. Thereupon Ramsey called appellant and told him the money would have to be produced again. On that or the next day appellant returned the $2,000 to Ramsey. Subsequently, $1500 of this money was returned to Ramsey by Officer Lorge, the latter stating that he had to use $500 for expenses. In the early part of October appellant told Ramsey he was afraid the deal "blew up"; that his wife got a "little high" the night before and talked too much to a couple of police officers. A day or two later Officer Lorge came to Ramsey's home and told the latter two of the councilmen had heard of Mrs. Suter's statements and were very much wrought up about the situation, because the two officers had informed Mr. Wright, and the latter had stated that if Mrs. Wurster did give a bribe in any way that he would be glad to put her in jail. Wright told Mrs. Wurster never to call him again and that if he were appointed chief of police he would get the office on his own merits and did not want any of her help.

Mr. Wright was appointed chief of police on October 17, 1939, and on that day Ramsey had a conversation with Mrs. Wurster and Officer Lorge in which Ramsey suggested that Wright had apparently gotten in through his own efforts, to which Mrs. Wurster replied, "No, no, the two which she had contacted would be expecting their money and they also would be looking for their cut of the 25% of the net, and she said, we will have to have at least $2,000 to give to Moxley, who in turn can take care of Carl," whereupon Ramsey inquired about the rest of the money and Officer Lorge suggested they divide it among themselves. A few days thereafter Ramsey telephoned appellant and went to see him. On that occasion he told appellant, "We will have to have the $5,000 for the councilmen." Later appellant, accompanied by Mr. Irvine, met with Lorge and Ramsey, and appellant stated to Lorge that the payoff would be made monthly right after the first of every month. Later that day appellant and Irvine came to Ramsey's house, where they counted out $4,500 and gave the money to Ramsey. Ramsey then stated they were $500 short, to which appellant replied that the total amount was

supposed to be $5,000 and that Lorge had already used $500, so that the $4,500 plus what Lorge had already kept would make the total of $5,000 in accordance with their agreement. Ramsey further testified that he talked with appellant about the $5,000 before Mr. Wright was appointed chief of police and also talked with him about the $4,500 after the appointment; that he informed appellant that the $5,000 was to be used on councilmen and other contacts that might be needed in order to get Mr. Wright in as chief of police. When Ramsey received the $4,500, he turned it over to Officer Lorge, who gave Ramsey $625 and stated that he would take a like amount, give the new chief of police the same sum, and take the rest of it down to Mrs. Wurster. Thereafter, during the latter part of October, Ramsey saw Mrs. Wurster, who informed him that Lorge had given her the balance, $2,625, and that she had delivered $2,000 thereof to a councilman who in turn was to give one-half thereof to another member of the council. During the latter part of October Ramsey had a conversation with Officer Lorge and appellant relative to the location of the bookmaking business, at which time appellant wanted to know when he could move in town, and was informed by Officer Lorge that no reason appeared why he could not move in the first of November, to which appellant replied, ''All right, we will go on and make arrangements to that effect.''

Ramsey further testified that shortly after the first of November Officer Lorge asked him to obtain the addresses of the agents who called their bets in to appellant and Mr. Irvine, and also to obtain the license numbers of their cars, in order that the connection of such persons with appellant and Irvine might be known to the police department. Ramsey communicated with appellant and conveyed to him Lorge's request. Thereafter, Mr. Irvine gave such addresses and license numbers to the witness Ramsey, who in turn delivered them to Officer Lorge, the latter of whom said, ''All right, I will turn them over to the proper ones, so that they can take care of them.''

About December 1, 1939, Officer Lorge asked Ramsey if it was not payday and made inquiry as to whether appellant and Irvine had left any money, to which the witness Ramsey replied, ''Not yet, I will see him.'' Ramsey did see appellant that evening, informed him that a month had passed by, and

that it was time to pay off, to which appellant replied, according to Ramsey, ''That they had not made anything so far, and furthermore, they could not seem to get any better protection than the rest of the bookmakers in town, and he said, I don't feel I should give you any money, and he didn't.'' According to Ramsey, Mrs. Wurster also inquired of him in the early part of December and about the first of the year 1940 as to whether he had collected any money, to which Ramsey replied that he had not. Just prior to the first of January, 1940, Ramsey again advised appellant and Irvine that it was around the first of the month and he thought they had better be paying, to which they replied, ''No, we are not paying until we get different protection, and we are still not making any money.''

We shall first give consideration to appellant's claim that the corroboration of the coconspirator Ramsey's testimony was insufficient to meet legal requirements in that regard. That Ramsey was an accomplice is unquestioned. A reading of section 1111 of the Penal Code immediately suggests that such statute imperatively makes corroboration of the testimony of an accomplice an essential prerequisite to the conviction of a defendant where the crime charged rests primarily and solely upon the testimony of such accomplice. As a rule of guidance in determining the sufficiency of corroboration, our Supreme Court, in *People* v. *Morton,* 139 Cal. 719, 724 [73 Pac. 609], quoted with approval the following language found in *Weldon* v. *State,* 10 Tex. App. 400: '' . . . eliminate from the case the evidence of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be any inculpatory evidence—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no *inculpatory* evidence, there is no corroboration, although the accomplice may be corroborated in regard to any number of facts sworn to by him.'' In the same case of *People* v. *Morton, supra,* our Supreme Court voices its approval of the rule as stated in *Simms* v. *State,* 8 Tex. App. 230: ''The evidence must tend directly and immediately to connect the defendant with the commission of the offense.'' In New York, under a code provision similar to our own (Code Crim. Proc., sec. 399), it was said in *People* v. *Ryland,* 28 Hun, 568, 570, ''The corroboration, however strong in all other respects, must

point to the connection of the defendant with the commission of the crime to be of any avail.''

It is firmly established in the law of this state that by way of corroboration more than mere suspicion is required. (*People* v. *Kempley,* 205 Cal. 441, 456 [271 Pac. 478], and cases therein cited; *People* v. *Davis,* 210 Cal. 540 [293 Pac. 32].) However, though more is required by way of corroboration than to raise a mere suspicion (*People* v. *Thompson,* 50 Cal. 480), nevertheless, the corroborating evidence is sufficient, if it, standing by itself, tends to connect the defendant with the commission of the offense, even though it be slight, and when standing alone entitled to but little consideration. (*People* v. *McLean,* 84 Cal. 480 [24 Pac. 32].)

Bearing in mind the principles just enunciated, let us now turn to the record to discern in what respects, if at all, the testimony of the accomplice Ramsey was sufficiently corroborated. By and through the testimony of other witnesses, numerous facts were proved. Willard S. Sibray was a bookmaker working for appellant in the capacity of a ''telephone man''. He testified that three weeks prior to the election of the city council in Long Beach appellant asked him if he could explain the method by which the chief of police of said city was selected, and the witness told him that to the best of his knowledge that official was appointed by the city council and confirmed by the city manager. Appellant also asked him if it would be possible for the right councilman to put in a chief of police that he (appellant) or someone else would select, to which the witness at that time replied that it would be very dangerous to have anything to do with donating money to appoint anybody, and cautioned appellant not to have anything to do with handling the money himself. This witness further testified that appellant told him he had a chance to put up some money to secure the appointment of a chief of police to allow them to enter the city of Long Beach and extend the scope of their business so that they would be free from arrest and be able to control the bookmaking activities of that city. The next day appellant told Mr. Sibray it would take a great deal of money to handle the proposition if it went through, and he would have to get somebody else to assist him. This witness also testified that between the latter part of August, 1939, and October 15th of the same year, defendant Officer Lorge phoned to appellant's bookmaking establishment, upon each of which occasions the witness an-

swered the telephone and Officer Lorge asked for appellant. Upon one of these occasions the witness overheard appellant say over the telephone, ''That is too much money.'' Upon another of these times appellant said over the telephone to Officer Lorge, ''O. K., I will see you in fifteen or twenty minutes,'' whereupon appellant took a billfold from his pocket and counted out two stacks of bills amounting to one or two thousand dollars, and asked the witness to check them over as to the amount, whereupon appellant put the money in his pocket and left. Upon the occasion of another of Officer Lorge's phone calls, the witness heard appellant remark, ''All right, we are all set if I can raise $5,000.'' In the latter part of October appellant told this witness, ''We were to arrange a method of handling and recording bets not only for ourselves but for other bookmakers who would be gathered under one roof in one room, so that the bookmaking of the city of Long Beach could be combined, and that we must devise a method whereby we could check on all the bookmakers to prevent errors happening and to keep the accounts straight.'' The same witness further testified that in the middle of November, 1939, appellant said in the presence of the witness and others that all men who owned automobiles should hand in slips showing the license numbers and a complete description of the car, so that it could be turned over to defendant Patrick E. Irvine, who was in turn to place such information in the hands of the police vice squad, so that there would be no interference on the part of the latter with those who operated these automobiles. There was also testimony that during the latter part of September, 1939, following a telephone conversation with a bookmaker, appellant remarked, ''Now I have got to raise five thousand bucks,'' and on November 2 or 3, 1939, according to the witness Sibray, appellant told him that they would all be notified before any ''knockover'' occurred.

Another witness, J. W. Bent, who was also a bookmaker, testified that he had a conversation with appellant about July 9th, in which the latter said they were going to form a combination, and if a certain man was elected to office they would have protection to run a book, and that the bankroll in this book would be about $10,000, and that the witness Bent would have 10 per cent of the profits if he would put up $2,500. About two weeks later appellant went to Bent's home and in the presence of the latter and his wife stated

that in order to get a certain man elected he would need $700 and inquired of Bent if he had the money to put up. Upon inquiry by Mrs. Bent as to how the proposition was going to work out, appellant told her that the money would be used to elect a certain man into office, and if that particular man were elected there would be no interference with bookmaking and certain bookmakers would have protection to operate unmolested. Upon inquiry by Mrs. Bent as to what other bookmakers who were not receiving such protection would do, appellant informed her that those who did not join the combination would experience considerable trouble operating their business. Mrs. Bent disapproved of the proposal and told appellant she did not think it was right. The next day, however, her husband gave appellant $700 which was returned to him three weeks later with the remark by appellant that "the deal did not go through". On the evening of October 17, 1939, appellant again communicated with Bent, inquiring if the latter was able to pay $2,500, stating that their man was in office and everything "was all set", and further advised that those who were not "in on the combination would have pretty tough sledding because the people in on the deal were going to get a 25% cut on the profits of the books, and it would be to their benefit to see that no other book operated". On this occasion the witness Bent told appellant his wife was very much against the proposition; that he himself was not in favor of it, and could not join in. Three days after this refusal on his part Bent's bookmaking establishment was raided by the police.

S. W. Tubbs, a police officer of the city of Long Beach, was approached by defendant Officer Lorge in the office of the vice squad during the first few days of November, 1939, and was told that Wright had been appointed chief and had named Officer Lorge to take charge of all bookmaking activities, and that the witness Tubbs was to work on the bookmaking detail and to take orders from Lorge. The latter told Officer Tubbs on that occasion that what Chief Wright wanted to do with the bookmakers was to get them all down in the harbor in one place, and if there were any complaints on the agents to turn such complaints over to Lorge, who would get in touch with the bookmakers and the latter would refuse to take any more bets from such agents, thereby forcing them out of business. Defendant Officer Lorge thereafter gave Officer Tubbs three index cards containing a list of bookmaking agents

for him to copy, and from time to time also gave Tubbs slips of paper containing the names and addresses of those engaged in bookmaking activities.

William C. Wright, who was appointed chief of police of Long Beach on October 17, 1939, had a conversation with defendant Lorge concerning the former's aspirations. Thereafter Officer Lorge came to Chief Wright's home and said he would like the latter to meet a Mrs. Wurster; that she was a person who had been quite active in most of the councilmen's campaigns; that she knew all of them, talked to them, and that it was quite apparent there was going to be a change in the city manager and the chief of police; that he thought Mrs. Wurster would be able to do Wright a lot of good by way of obtaining for him the appointment as chief of police. On that day Wright accompanied Lorge to Mrs. Wurster's house. Wright was also introduced to the accomplice Ramsey by defendant Lorge, who informed Ramsey that Mr. Wright was the person who had been mentioned as the possible chief of police. In August or September, 1939, Chief Wright, accompanied by his wife, in response to a telephone request from Mrs. Wurster, went to the latter's home. There he met Ramsey, Lorge and Mrs. Wurster. While Mr. and Mrs. Wright were there the doorbell rang, Mrs. Wurster went to the door, and upon her return said, "This man Carroll is at the door," and showed Mr. and Mrs. Wright into a back bedroom. Although Wright did not see the party who called, he heard Mrs. Wurster say as the caller was leaving that she felt that Mr. Wright would make a good chief of police. Mrs. Wurster thereupon informed Wright that she was speaking to a city councilman, and that it would be worth $1,000 to see the then chief of police discharged.

About the first week in October, 1939, Chief Wright met with Officer Lorge and Mrs. Wurster, informed them he had heard some rumors regarding some sort of deal where there were bookmakers putting up some money on the furtherance of his appointment, and that their names had been connected with it. In response to Wright's query as to what they knew about it, they said they knew nothing whatever. Upon that occasion Chief Wright informed Officer Lorge and Mrs. Wurster that he did not care to see them or discuss the matter with them, and for them not to do anything in connection with his desire for appointment as chief of police.

A city councilman who was also engaged in the insurance business responded to a telephone request from Mrs. Wurster in regard to an insurance policy. During that conversation Mrs. Wurster told the councilman that she would like to see a change in the office of chief of police; that Mr. Wright was in her opinion qualified, and that there would be "money in it for the fellow who would make the change". She then took something out of the piano, held it in her hand and said she had a thousand dollars there to show that she "was not fooling". The councilman replied that he was not interested, and left. Another councilman testified that he was approached by Mrs. Wurster about October 7th, upon which occasion she said she would like to see Mr. Wright made chief of police, highly recommended him, and advised that the gambling interests were back of him, and that there was money up for his appointment. Still another councilman testified that in a conversation with Mrs. Wurster about the middle of November she said, "I think the gambling interests would be willing to pay $1,000 to see Wright made chief"; to which this councilman replied, "They don't need to contact me because I think Wright is a good man and they are just trying to discredit him by boosting for him." Another councilman was told by Mrs. Wurster that if Wright were appointed chief of police there was $4,000 in it; that the gambling interests were going to pay that sum for his appointment. This councilman replied that he was not interested; that he had served as a member of the grand jury in Los Angeles County and had seen many people in trouble because of that kind of activities, and if anyone offered him any money they would have to tell their story to the grand jury.

■ Certainly there is nothing in the record from which it could be concluded that the foregoing witnesses, Sibray, Tubbs, or Mrs. Bent, were liable to prosecution for the identical offense charged against the defendants in the instant prosecution in which the testimony of the accomplice Ramsey was given. Hence they were not accomplices (Pen. Code, sec. 1111); and their testimony as herein narrated certainly tended to connect appellant with the commission of the offenses with which he was charged. Such corroborative evidence, therefore, met the requirements of our law.

■ Appellant insists that the trial court erred in admitting into evidence the acts and declarations of his co-

conspirators made outside his presence prior to proof of the existence of the conspiracy by other and independent evidence. Beyond question it is the general rule that proof of the existence of a conspiracy ordinarily should precede proof of the acts or declarations of a coconspirator made during the conspiracy or in assistance of the common design; but such rule is not absolute, and sometimes, such as in the case at bar, the facts from which the conspiracy is to be inferred are so intimately blended with the other facts going to constitute the crime that it is difficult to separate them, and in such cases the admission of evidence of acts and declarations of an alleged coconspirator prior to the production of sufficient proof by other and independent evidence of the existence of such conspiracy, is a matter committed to the sound discretion of the trial judge, and we perceive no abuse of such discretion in the instant case. (*People* v. *Fehrenbach,* 102 Cal. 394 [36 Pac. 678] ; *People* v. *Sing,* 42 Cal. App. 385, 397 [183 Pac. 865] ; *People* v. *Rodley,* 131 Cal. 240, 253 [63 Pac. 351].) When we contemplate all the evidence introduced at the trial, we have no hesitancy in saying that it abundantly warranted the determination of the jury that a conspiracy to secure the appointment of a chief of police by the liberal use of bribes with the appointing power and to thereafter procure immunity from prosecution for violations of the law did in fact exist as alleged in the indictment. When, as here, there was present in the record at the conclusion of the trial sufficient competent evidence from which the jury might legally reach a conclusion that by means of an established conspiracy appellant committed the offenses of which he was convicted, then no substantial prejudice was created against him; and the so-called "order of proof" assumes no consequence when no prejudice to a defendant arises from the exercise by the court of its sound discretion in admitting such evidence by denial of appellant's motion to strike at the time all the evidence was submitted to the jury for its consideration. (*People* v. *Compton,* 123 Cal. 403 [56 Pac. 44] ; *People* v. *Collier,* 111 Cal. App. 215 [295 Pac. 898].)

We are in thorough accord with appellant's conception that the general rule "that statements or declarations of one coconspirator may be used against his coconspirator, requires not only that the conspiracy be pending at the time and its object not accomplished, but also that such statements must

be made in furtherance of the common purpose or design of the conspiracy''. In fact, this court so held in *People* v. *Gilliland,* 39 Cal. App. (2d) 250 [103 Pac. (2d) 179]. Appellant's theory in the instant case is founded on the claim that the object of the conspiracy was accomplished when, on October 17, 1939, W. C. Wright was appointed chief of police, and therefore any acts or declarations of conspirators made outside the presence of appellant after such date were incompetent, immaterial and inadmissible. It has been held that the common design of a criminal enterprise may extend in point of time beyond the actual commission of the act constituting the crime for which the accused is being tried, such as for the purpose of concealing the crime, securing the proceeds thereof, sharing in or dividing the proceeds of the crime, or bribing or influencing witnesses, and that consequently, evidence is admissible to prove acts committed after (*Hollingshead* v. *State,* 21 Okl. Cr. 306 [207 Pac. 104]), as well as before (*People* v. *Arnold,* 199 Cal. 471 [250 Pac. 168]) the perpetration of the crime for which the accused is on trial. Of course, it must reasonably appear that such acts were committed in furtherance of the common design of the conspiracy. It must also be remembered that the question when the design is accomplished, abandoned or frustrated, and whether the acts proved are a part of the design of the conspiracy, are for the jury to determine from the facts and circumstances of each case and the nature and purpose of the conspiracy. ▮ In other words, the question of whether or not the acts committed subsequent to the commission of the crime are the ordinary and probable effect of the common design, or whether they are a fresh and independent product of the mind, outside of· and foreign to the object of the original scheme, is for the jury to decide. If there be any evidence to support the findings made by the jury on any of the foregoing questions, its determination thereof is conclusive on appeal. (*People* v. *Lorraine,* 90 Cal. App. 317 [265 Pac. 893].) A review of the record in this case indicates that the object of the unlawful enterprise was not only to secure the appointment of a chief of police who would immunize from arrest certain bookmaking establishments, but also to thereby enable appellant and his coconspirators to continue thereafter to control the operation of bookmaking activities in the city of Long Beach, in return for which power appellant and his confederates were to pay $5,000 and a monthly ''payoff'' of

25 per cent of the bookmaking profits to city councilmen and others involved. The objectives of the conspiracy, in other words, contemplated not only the appointment of a certain chief of police, but thereafter the continued ''protection'' of appellant and his and other bookmaking establishments in Long Beach. There being ample proof of the existence of a conspiracy herein as a continuing one, the evidence of acts and declarations occurring after the accomplishment of the primary objective, viz., the appointment of a certain man as chief of police, were admissible as being in furtherance of the general plan of the conspiracy in its entirety.

■ Appellant next contends that it was error for the court to admit in evidence what he terms ''fragmentary parts'' of the telephone conversations heretofore set forth held between appellant and other persons, as testified to by the witness Sibray. We conclude that the portions of the conversations heard by the witness were intelligible and pertinent to the case when taken in connection with all the other facts and circumstances in evidence. If the part not heard by the witness would in any material respect modify or explain the part he heard, the appellant was privileged to give it in explanation. In the instant case appellant, by not becoming a witness in his own behalf, and the codefendant Officer Lorge, with whom the witness Sibray testified appellant was talking, not taking the witness stand in his defense, chose to neither deny nor explain the conversation, and the witness having testified to all the conversation he heard, its admission by the court under the circumstances present in this case was proper. The case of *People* v. *Rabalete,* 28 Cal. App. (2d) 480 [82 Pac. (2d) 707], decided by this court and cited by appellant, is easily distinguishable from the case at bar. In the cited case there was presented nothing which established the pertinency of the fragmentary portions of the conversation to the charge upon which the defendant was on trial and which would justify an inference that the defendant was occupying certain premises in violation of section 337a of the Penal Code. But such is not the case here. There was much in the portions of the conversations now before us and as heard by the witness which, when considered in the light of other facts and circumstances in evidence, established not only the pertinency, but the relevancy and materiality of such conversations to the issues before the jury, and from which portions of conversations inferences of the culpability of ap-

pellant could be drawn. The ruling of the trial court in admitting testimony of the portions of the conversations heard by the witness was correct.

██ Holding as we do that there was sufficient legal and competent evidence to support the verdict, it is clear that the trial court did not err in denying appellant's motion to advise the jury to acquit him. Had the court so advised the jury, the latter would have been justified, in view of the evidence before them and pursuant to section 1118 of the Penal Code, in declining to follow such advice from the court.

██ Appellant's next ground of appeal is thus stated: "Where there is no conflicting evidence as to a witness being an accomplice, and that fact stands undisputed in the testimony, the court should as a matter of law instruct the jury that such witness is an accomplice." By reason of this rule, appellant asserts that the court erred in giving to the jury an instruction as follows:

"The court instructs the jury that it is your duty to determine whether or not the witnesses, Robert W. Ramsey, S. W. Tubbs, W. S. Sibray, J. W. Bent and Vera Bent are coconspirators in the commission of the offense charged in Count I of the indictment herein and for which the defendants are on trial, and if you so decide then the instructions that are here given to you on the subject of coconspirators should be applied by you to the testimony of said witnesses."

As to the witnesses Tubbs, Sibray, and J. W. and Vera Bent, the instruction was absolutely correct, because as heretofore in this opinion pointed out, it appears from the record that the witnesses Tubbs, Sibray and Mrs. Bent as a matter of law were not accomplices, and while as to the witness J. W. Bent, even though we assume that there is evidence tending to connect him with the crime, the facts in connection therewith are susceptible of different inferences, and therefore the question of complicity is one to be decided by the jury. (*People* v. *Payton,* 36 Cal. App. (2d) 41, 45 [96 Pac. (2d) 991].) As to the witness Robert W. Ramsey, there can be no doubt but that he was an accomplice, and the court so instructed the jury in the following explicit language contained in another instruction: " . . . In that connection, you are further instructed that the witness Robert Ramsey has testified to matters in the cause on trial which, if true, would make him an accomplice of the defendants and you are therefore instructed that you will consider him as an accomplice.

. . . ʼʼ It cannot, therefore, be held that any substantial right of appellant suffered as a result of the instruction under attack.

 It is next contended by appellant that the court erred in giving the following instruction:

"The City Manager shall have the power to appoint the Chief of the Police Department of the City of Long Beach, provided that such appointment by the City Manager must be with the confirmation of the City Council. The Chief of police so appointed shall serve during the pleasure of the City Manager.

"You are further instructed that under the provisions of the City Charter of the City of Long Beach the matter of the appointment of a Chief of Police of the City of Long Beach and a confirmation by the City Council of such appointment is a matter which may under the law come before them at any time for their official consideration, and consequently is a matter continuously pending before the City Manager and City Council of said City."

In support of the claim of error appellant asserts that "the object of the conspiracy charged in the indictment was limited to influencing of certain members of the city council, not on the confirmation of any person as chief of police, but to one person, namely, W. C. Wright". We must agree with appellant that the concluding part of the just-quoted instruction uses language too broad in its scope, but when considered in the light of another instruction given immediately thereafter on the court's own motion, it seems only reasonable to assume that no confusion could arise in the minds of the jurors or that any of appellant's substantial rights were impaired by the concluding phrase of the challenged instruction. The instruction which we feel cured any error that occurred from the broad language of the former instruction was as follows:

"But this indictment limits the conspiracy charged to an effort to influence five members of the council, not on the confirmation of *any* Chief of Police who would yield to their purpose but to one person, namely, W. C. Wright, and there is no dispute that he was appointed and confirmed as Chief of Police on October 17, 1939; therefore you are instructed that in order for you to find each particular defendant guilty of the conspiracy charged in count I, you must find that such defendant, prior to October 17, 1939, joined the conspiracy to bribe five councilmen for their vote on October 17, 1939,

to confirm W. C. Wright as Chief of Police of the City of Long Beach. . . . ''

After both sides had rested at the trial the court granted a motion made by the district attorney to amend the indictment by inserting the words, ''to-wit, money'', following that portion of the allegation in the indictment that the defendants named therein ''did wilfully, unlawfully, feloniously and corruptly offer and give a bribe or bribes''; and prior to the mentioning in the indictment of the names of the councilmen named therein, there were added the words ''any five of the following persons, to-wit''. Appellant here contends that he was entitled to be re-arraigned upon the indictment as amended and to time within which to plead thereto. Section 1008 of the Penal Code, as amended in 1927, and pursuant to which section the amendments were allowed, reads as follows:

''An indictment or information may be amended by the district attorney without leave of court, at any time before the defendant pleads. The court may order its amendment for any defect or insufficiency, at any stage of the proceedings; and the trial shall continue as if it had been originally filed as amended, unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable continuance, not longer than the ends of justice require, may be granted. If the defect or insufficiency be one that cannot be remedied by amendment, the proceedings shall be dismissed, but the defendant shall not be discharged if the court shall direct the filing of a new information or the submission of the case to the same or a new grand jury. An indictment cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination.''

Obviously the section just quoted authorizes the type and kind of amendments permitted in the instant cause. It is only when the substantial rights of the defendant are prejudiced by the amendments that a continuance need be granted. Where, as here, the defendant had pleaded to the indictment as originally returned by the grand jury, and the district attorney was thereafter permitted to amend the pleading to the end that it might show with more particularity the offense charged, but did not change the offense, such amendment could not have prejudiced the substantial rights of the accused, and we are bound to hold that such amendments were not improperly allowed, nor was the court in error when it

denied to appellant a continuance to afford him an opportunity to demur or plead to the indictment as amended. (*People* v. *Bryant,* 101 Cal. App. 84, 86, 87 [281 Pac. 404].) This is especially true in the case at bar, where the trial court afforded appellant every opportunity to present any defense he might have to the indictment as amended, and did in fact upon request of the defendants permit the case to be reopened for the purpose of receiving testimony proffered by them of certain councilmen who had not testified for the prosecution, and which testimony was to the effect that such councilmen were never offered a bribe by any of the defendants.

We have painstakingly and carefully reviewed the voluminous reporter's transcript filed herein, from which we conclude that appellant had a fair and impartial trial. In fact the learned trial judge displayed to the defense unusual consideration and patience, while the record is singularly free from error.

For the foregoing reasons, the judgments and the order by which the motion for a new trial was denied are, and each of them is, affirmed.

York, P. J., and Doran, J., concurred.