[Crim. No. 2423. First Dist., Div. One. Apr. 14, 1947.]

THE PEOPLE, Respondent, v. FREDERICK W. HENDERSON et al., Appellants.

Vincent W. Hallinan, Harry G. Henderson and Russell T. Ainsworth for Appellant.

Robert W. Kenny, Attorney General, Clarence A. Linn, Assistant Attorney General, David K. Lener, Deputy Attorney General, Ralph E. Hoyt, District Attorney, Folger Emerson and Arthur H. Sherry, Assistant District Attorneys, for Respondent.

PETERS, P. J.—Frederick W. Henderson and Jack Moore were jointly indicted, tried and convicted on ten counts of grand theft (fraudulent representations knowingly and de-

signedly made to defraud persons of money, as prohibited by Pen. Code, § 484) and one count of conspiracy (obtaining money by means of false promises with the fraudulent intent not to perform such promises, as prohibited by Pen. Code, § 182, subd. 4). They separately appeal from the judgment of conviction and order denying their motions for a new trial. By its various commitments the trial court provided that Henderson's terms under the first three counts should run consecutively, with the remaining terms to run concurrently, whereas Moore's terms are all to run concurrently.

These cases took over two weeks to try. The reporter's transcript totals nearly 2,000 pages. The following tabulation will serve to summarize the provisions of the indictment. Both defendants were charged as follows:

| Count | Date | Nature of crime | Amount | Victim |
|-------|------|-----------------|--------|--------|
| 1. | 8/17/45 | grand theft | $ 1,000 | Mildred and Wm. Swift, Jr. |
| 2. | 9/28/45 | grand theft | $ 4,500 | Alta and F. Lyle Barnes |
| 3. | 9/8/45 | grand theft | $ 1,000 | Alice T. and Wm. C. Roddick |
| 4. | 9/19/45 | grand theft | $ 1,750 | Hallet and W. M. Pearl |
| 5. | 9/29/45 | grand theft | $ 3,000 | Ruth L. and Norman Hamstad |
| 6. | 9/20/45 | grand theft | $ 500 | Delylia Hickman |
| 7. | 9/18/45 | grand theft | $ 600 | Everett L. Morgan |
| 8. | 10/12/45 | grand theft | $ 1,500 | Lillian B. and Chas. C. Adams |
| 9. | 9/5/45 | grand theft | $ 1,000 | Alberta A. and Claude H. Buchanan |
| 10. | 9/17/45 | grand theft | $ 2,000 | Estella M. Barnes |
| 11. | 7/25/45 to 1/17/46 | conspiracy to cheat by false promises with fraudulent intent not to perform same. | $12,300 | Fifteen overt acts relating to transactions with George Sims, Albert and Everett Morgan, Norma and Robert Wilson, Richard Hilken, Ida and A. O. Bass, Adrianne and Gustav Lund. |

The prosecution of these defendants grew out of the operation by them of what purported to be a general contracting business conducted by Henderson under the name, The Bay Pacific Company. Moore was associated with the enterprise, first as salesman and later as general sales manager. These two men and others from July of 1945 to January of 1946, when they were arrested, devoted their principal efforts towards the solicitation of contracts calling for the construction of new homes and business buildings. The evidence shows that the appellants sold many contracts during this period and collected from the persons desiring to build substantial sums of money. It also shows that in the course of selling these construction contracts numerous false representations were made in order to induce the prospective customers to enter into these contracts. It is these false promises and the failure to perform these contracts that form the basis of this prosecution.

Both appellants urge that the evidence is insufficient to sustain the verdicts. Such contention, so far as Henderson is concerned, totally lacks merit. So far as Moore is concerned, the contention is partly meritorious, as will later appear.

Henderson was the promoter and organizer of the entire project. He, apparently, is a man of unusual talents and imagination. At the time of trial he was but 28 years of age. His father is a building contractor, and Henderson got his first building experience with him. This appellant started on his own as a builder in Stamford, Connecticut, in 1939. He conceived the idea of building houses in groups on an assembly line basis, the workmen working in crews on a piece-work basis. He figured that he could thus build a house, complete, in twenty-four or five working days. He started to put this plan into effect in Westchester County, New York. On the first sixty houses thus constructed he made a net profit of $500 or $600 per house, but he shortly ran into difficulties with labor unions and with various contractors. His plan envisaged the dispensing with subcontractors. There were over a hundred more houses constructed on a fixed price basis, and because of these difficulties he went broke, losing over $100,000. He then worked for a while in Washington, D. C., and in Virginia, and then was forced to stop work because of rheumatic fever. While ill he worked out a plan to eliminate the difficulties he had run into in New York. It was the plan thus conceived that he attempted to put into effect in Alameda

County. The plan included cost, plus a percentage of profit, contracts, to do away with the danger of loss from fixed price contracts. It included the concept of the one construction company hiring at high wages skilled mechanics in all branches of the building industry, thus dispensing with subcontractors. It envisaged the building company owning many of its own sources of materials, particularly lumber, and purchasing other materials in large lots. It included the building company working out all details of financing the various projects and furnishing to their clients every service necessary to the purchasing, designing, financing and constructing a house.

With this general plan in mind Henderson came to San Francisco in December, 1944. For a short while he worked with a wrecking company and then was hired to sell paint jobs for a painting company. At this company he first met M. R. Arnold, who subsequently became associated with Henderson, and who was one of the State's witnesses. Henderson put on such a campaign selling paint jobs for his employer that he was shortly bringing in ninety per cent of all paint jobs performed by his employer. In March, 1945, he quit this job, and in April started to organize The Bay Pacific Company. This company mushroomed in startling fashion.

Henderson's original plan was to organize a corporation and to turn over the assets and liabilities of his company to it. A corporation called Bay Pacific Corporation was in fact incorporated in August, 1945, and a permit to sell stock was secured which required the first $25,000 secured from the sale of stock to be escrowed. This permit was voluntarily surrendered in November of 1945. The corporation at no time operated the business in question. The business was the sole property of Henderson. Many of the contracts and receipts introduced into evidence are signed "Frederick W. Henderson, Sole Owner," and many of the checks introduced into evidence were endorsed "Bay Pacific Company . . . F. W. Henderson, Sole Owner."

At this point a few words should be said about appellant Moore. Until he became associated with Henderson, in July of 1945, he was in the reroofing and remodeling business in Tacoma, Washington. He had responsible positions with responsible concerns in Sacramento and Los Angeles and had been in business for himself in Montana where he first met Arnold, who recommended him to Henderson.

The amazing development of The Bay Pacific Company was testified to by Henderson and by several of his employees. The company was started on $5,000 that Henderson borrowed from some friends. To trace in detail the activities of this company and the activities of Henderson and Moore, as disclosed in this lengthy record, would extend this opinion to unreasonable length. The best that can be done is to summarize, briefly, these activities, and for that purpose the following outline has been prepared: `

*Outline of Activities of Bay Pacific Company from April, 1945, to January, 1946.*

. (P.—People's; D.—Defendants'.)

*April, 1945* `Henderson.`
Company started operations with a number of painters and carpenters to handle painting and remodeling and construction jobs. M. R. Arnold is induced to work for the company.

*Kenneth Bugbee.*
Henderson represented to Bugbee, secretary of the Wholesale Credit Ass'n. in Oakland, that he was worth $18,000, consisting of an equity of $5,000 in the building in which the company had an office, $8,000 worth of equipment and $5,000 cash.

*Henderson.*
Henderson's version was that Bugbee agreed "to kill" a report of his labor difficulties in the East if Henderson would not ask for credit "until I deserved it from anybody, except my friends."

*April 20, 1945* *P. Exhibit #92.*
Henderson applied for a contractor's license stating in his sworn application that he had $18,865 in assets, including $5,000 in cash free of liens or any claims. (This was the borrowed capital.)

*Henderson.*
Henderson testified that he was told by Harry Abrahams of the Contractors' License Board that this statement was to secure a contractor's license only, but Abrahams testified that he always tells people that the application is a sworn statement. The application form clearly stated:

*P. Exhibit #92.*
"Misrepresentation of a material fact by an applicant in obtaining a license constitutes a cause for disciplinary ac-

tion . . . [and] is grounds for refusal or subsequent revocation of a license.''

*May 9 or May 10, 1945* *Henderson.*
Contractor's license issued to Henderson.

*May, 1945* *Henderson.*
Henderson's lawyer, a relative, drew up a form contract for selling construction on a cost-plus basis.

*June, 1945* *Henderson.*
One Hobson who claimed that he owned 10 million feet of fir timber near Willitts and a sawmill that needed a new top saw offered to sell to Henderson.

*July, 1945* *Henderson.*
One Charles Larson was hired to take charge of Hobson's mill.

*July 14, 1945* *P. Exhibit #93.*
The Hobsons signed a bill of sale of ''All of the sound, merchantable timber . . . within the 'Watson' Ranch in Mendocino County, California . . . in no event will there prove to be less than five (5) million board feet.''

 *P. Exhibit #94.*
Henderson gave the Hobsons $12,000 worth of notes due in a year with the privilege of renewal for another year. Interest was 6%.

*July, 1945* *Henderson.*
Henderson and Arnold met one Firestone who suggested that they look for timber at Garberville.

*July, 1945* *Claude McColm.*
One Claude McColm, an employee of a paint company, called upon The Bay Pacific Company and got a financial statement. Henderson told him that certain property in Claremont Heights was subject to being built upon by the company.

*July 17, 1945* *D. Exhibit #P.*
Arnold wrote to Moore to come to Oakland and join the company.

*July 19, 1945* *D. Exhibit #Q.*
Arnold telegraphed Moore to come to Oakland not later than July 23rd.

*July 23, 24, 1945* *Moore.*
Moore arrived and met Henderson. He was shown two build-
ings constructed by the company. At Henderson's sugges-
tion Moore accompanied one of the salesmen while he called
on prospective customers.

*George Sims.*
George Sims was one of the customers visited. Sims testi-
fied that Moore told him that he was going to Spokane to pro-
cure a lumber mill for the company. Moore denied this.

*July, 1945* *Al Young.*
Al Young, an engineer, was employed as construction super-
intendent. He was interested in a ceramic tile company.
He stayed in the company's employ until December, 1945.

*July, 1945* *Clarence Lee Dong.*
Henderson met Clarence Lee Dong who intended to open
an electric appliance shop in San Francisco. Dong agreed
to furnish Henderson with appliances if he could get them.
Henderson was to have no interest in Dong's enterprise.
Henderson hired him to sell lots in Claremont Heights,
stating that he owned those lots.

*July 26, 1945* *Sims. P. Exhibit #s 48, 49.*
George Sims signed a cost-plus contract for a bar, restaurant
and apartment unit which Henderson signed. Sims made a
down payment of $5,000. (Count 11.)

*July 28, 1945* *P. Exhibit #66.*
Arnold, on behalf of the company, signed a contract with
Willis Perry of Garberville for purchase of timber on his
land. Under the contract the buyer was to erect a saw-
mill and to pay the seller $1.00 per thousand board feet for
all lumber milled.

*August, 1945* *Douglas Miller. P. Exhibit #57.*
One Douglas Miller contracted to perform architectural
services for company on a flat fee per house basis. Miller
bought what drafting equipment Henderson had and hired a
couple of men who had been working for Henderson.

*August, 1945* *Sims.*
Sims discussed plans with Miller and had several conferences
with Moore. Moore told him ''they had their own lumber
and their own sawmills . . . plumbing, water heaters . . .
[that] they didn't have to sub-let the electrical and plumbing
. . . that they had all those fellows.''

*August 1, 1945* *Whiting.*
Harris Whiting employed to take charge of production.

*August 7, 1945* *Moore. D. Exhibit #R.*
Moore had gone back to Tácoma. He now returned and apparently acted as a salesman until August 20th, when he was hired to take charge of sales.

*August 7, 1945* *P. Exhibit #83.*
George and Tena Gatliff (similar offense), in presence of Moore and Henderson, signed a cost-plus contract and made a $1,000 down payment.

 *Tena Gatliff.*
Tena testified that Henderson said that "I have a lumber mill up in Oregon"; that he "could get all his building material, plumbing material"; that "they was [sic] having lumber kiln-dried up in Oregon." Moore told her the house would be started by October 15th.

*August 13, 1945* *D. Exhibit #C.*
Contract between Bay Pacific Company and Briceland for purchase of timber in stumpage form near Garberville.

*August, 1945* *Whiting.*
Whiting talked with a company about the possible repair of their kilns for drying lumber.

*August 13, 1945* *P. Exhibit #101.*
Arnold placed in full charge of Garberville project.

*August, 1945* *Henderson.*
Both Larson and Arnold told Henderson that the Hobson land was unsatisfactory, and the contract with the Hobsons was torn up.

*August 17, 1945* *Mildred Swift. P. Exhibit #12.*
Mildred and Wm. Swift, Jr. (Count one) signed a $1,000 contract and paid $1,000 down. They did not own a lot and the contract provided that if the builder could not "arrange a piece of property satisfactory to the owner, all monies [sic] paid under this contract will be returned without penalty." Henderson told the Swifts that they did not need a priority; that he had his own lumber mill, standing timber, his own painters, plasterers and plumbers.

*August 27, 1945* *D. Exhibit #W.*
August Rahlves, inspector of the State Contractors' License Board sent an interoffice memo to his deputy registrar noting

he had sent Henderson an application and had requested references. He commented on the showy offices of the company and concluded: ''This man is sure going to town.''

*August 28, 1945* *Tracy Clark. P. Exhibit #s 51, 52.*
Henderson authorized Tracy Clark, a real estate broker, to purchase some lots on Masonic Ave., gave Clark a rough suggestion of a form of contract for the purchase and $500 with which to open an escrow.

*September 1, 1945* *Claude Buchanan. P. Exhibit #28.*
Claude and Alberta Buchanan (Count 9) signed a cost-plus contract and paid $1,000. Moore told the Buchanans that the company had two mills off of the Redwood Highway, that they were able to bring in timber, that they were contracting to buy plumbing and electrical fixtures in the East by carload lots, that they would find a lot, that they would complete the building by Christmas, 1945, that they had a lumberyard at the foot of Gilman Street, and that they were contemplating securing another.

*Late Summer, 1945* *Joe Stern.*
Henderson arranged with Joe Stern to lease his property at Second and Gilman for a lumberyard until May, 1946, and in May, 1946, to buy it.

*September 5, 1945* *P. Exhibit #63.*
Alyce George Bell, owner of the Claremont Heights Tract, agreed to sell same to Henderson. The contract provided ''that the Purchaser shall have until November the first, 1945, to do such engineering work and other work entailed in the decision to purchase said property . . .''

*September 8, 1945* *Alice Roddick. P. Exhibit #s 15, 16.*
Wm. C. and Alice Roddick (Count 3) paid $1,000 and signed a cost-plus contract containing provisions for a bank loan and for refund of moneys collected. They told Henderson they desired a house built on land they owned in Castro Valley. He said he had materials, labor, Pabco paints; that his uncle was connected with the Atlas Furnace people, and that he owned a lumber mill. They said they had a priority from the O.P.A. but Henderson said that priorities would soon be off and he did not need it.

*Labor Day weekend, September, 1945* *Moore.*
Moore visited Garberville to see how Arnold and Perry were getting along. He found that a tool shed or blacksmith shop

had been built, as had an office which Arnold was using. Timber was being cut. A fellow was bulldozing ground to build a bunkhouse. A pipeline was in and some electric line. Work had been performed on a bridge. Arnold told Moore that the mill would probably be in by November.

*September, 1945* *Mary Lund.*
After seeing a classified ad in the Oakland Tribune, Mary Lund saw Moore who said he would guarantee to build a home for her by Christmas. He mentioned that they had their own lumber mills, tile affairs, plumbing fixtures, etc., and represented that the company was then building 100 homes. She signed a contract and paid $100.00. (Similar offense.)

*September 16, 1945* *P. Exhibit #37.*
Estella M. Barnes signed a cost-plus contract and paid $2,000. (Count 10.) The contract provided that "if the builder cannot arrange a piece of property satisfactory . . . or to obtain a satisfactory bank loan, all moneys paid will be returned."

 *Estella M. Barnes.*
Moore told her about the available lots behind their College Ave. office (Masonic Ave. lots.) He did not state where he could obtain needed materials except that "he had the lumber all seasoned."

*September 16, 1945* *Henderson. Perry.*
Henderson arrived in Garberville and found that Perry let Arnold do things backward—no mill in.

*September 18, 1945* *P. Exhibit #29.*
Albert L. Morgan (Count 11) and Everett L. Morgan gave Henderson $1,000 to be used in the construction of a factory for manufacturing Venetian Blinds.

 *Everett L. Morgan.*
Henderson said he would be able to build the factory next to the lumberyard so that the Morgans could get their lumber at cost and that he wanted to satisfy his demand for blinds from those the Morgans produced.

*September, 1945* *Henderson.*
Sumner Iron Works man told Henderson that he should not confine himself to a 50,000 foot mill at Garberville but should get a 100 foot band mill for an average cut of 80,000 feet of lumber a day which would cost $25,000 in cash. The $25,000 from the corporation funds after $25,000 worth of stock was sold would cover this.

*Harris Whiting. Henderson.*
Harris Whiting had sent for Jim French whom he had known since June, 1940, to take charge of construction for The Bay Pacific Company. He was then sent to Garberville to take over, instead of Arnold.

*September 18, 1945* *P. Exhibit #18.*
Hallet and W. M. Pearl (Count 4) signed a contract with the usual cost-plus provision, bank loan provision, as well as the refund provision.

*September 19, 1945* *Wm. Pearl. P. Exhibit #19.*
The Pearls paid Bay Pacific Company $1,750. Moore handled the entire transaction. He said they had kiln-dried lumber, carpenters, painters, plumbers, mill in Garberville, land at Second and Gilman. They were shown the Claremont Tract.

*September 20, 1945* *P. Exhibit #s 23, 24.*
Delylia Hickman (Count 6) signed a contract to have a house built upon her lot on Solano Avenue, Albany. It contained the usual provisions for refund but was a fixed price contract for $4,500. She paid $500.

*Delylia Hickman.*
Moore told her they could start October 15th, as he had plenty of lumber from their mills. Henderson told her he had bought a lot, Second and Gilman, for their lumberyard. She went there to see it.

*September 23, 1945* *P. Exhibit #s 4, 5.*
Lyle and Elsie Barnes signed a cost-plus contract which provided "if the builder is unable to arrange a piece of property satisfactory to the owner or to obtain a loan, all moneys will be returned without penalty . . ."

*F. Lyle Barnes.*
They paid $500. Moore told them they had mills for lumber and building material was available through their contracts with different plumbing supply and hardware places in the country. He said they had just got 5 lots in Rockridge (Masonic Ave.).

*Early Fall.* *Henderson.*
After Henderson got the stock permit for Bay Pacific Corporation he rented a banquet room three times at the Palace Hotel and entertained many big business men and discussed with them the future of the corporation.

*September 29, 1945 Norman Hamstad. P. Exhibit #20.*
Norman Hamstad (Count 5) paid $3,000 on a contract for
a house and lot. Usual terms. Moore told Hamstad they had
seasoned lumber, two carloads of plumbing, carpenters, plumb-
ers, etc.

*Fall, 1945 George Sims.*
Employees of The Bay Pacific Company cleared George Sims'
property.

*Fall, 1945 Mary Lund.*
Through the Better Business Bureau, Mary Lund's husband
got $100 back and surrendered their contract. (She phoned
Moore several times first.)

*Fall, 1945 Moore. Harris Whiting. D. Exhibit #s B, U.*
Harris Whiting completed an outline of the organization as
set up under the Production Dept., including administration,
architectural services, sales—wholesale and retail (material),
accounting, purchasing, lumberyards, warehouses, garage, esti-
mating, labor relations, steel construction, sash-door and plan-
ing mill, and lumber mills and procurement. A copy was
given Moore by Whiting.

*October 1, 1945 Lyle Barnes. P. Exhibit #6.*
F. Lyle Barnes authorized Wm. Phillips to buy a lot. Walsh
helped select it.

*October 1, 1945 Jewett Ivey.*
Jewett Ivey, owner of land in Alameda, saw Moore in new
San Francisco office about subdividing the property. Moore
told him Bay Pacific Company had all the equipment—road
building, engineers and surveyors—that they could put the
road through and pro-rate the costs among the lots. Bay
Pacific would have the exclusive building rights and Ivey
would get the purchase price of the lots.

*October 3, 1945 Everett L. Morgan. P. Exhibit #31.*
Henderson offered to get Venetian Blind materials for the
Morgans. He said that if they put up $1,000 he would ad-
vance $1,000 to get $2,000 worth. They gave him a check
for $1,000 signed ''Albert L. Morgan.'' (Count 7 of the in-
dictment alleges that Everett L. Morgan lost $600—this refers
to his share in the $1,000 paid to build a house. He testified,
however, that he did not give any checks, but that his brother
did. R.T. 296.)

*October 4, 1945* *P. Exhibit #65.*
Henderson contracted to buy the Murphy-Soda property on Eastshore Highway near Jacuzzi plant north of Albany for $50,000. "$10,000.00 at the time of closing title; $15,000.00 within six months of closing date; Balance payable in equal monthly installments over a period of five years."

*October 6, 1945* *P. Exhibit #65.*
Clause in Soda-Murphy contract as to payment of $15,000 changed to make date of payment 4 months.

*October 8, 1945* *Philip Murphy.*
Philip Murphy forwarded a legal description of property with instructions to prepare a deed and also executed a deed for Oakland Title Ins. Co. Negotiations stopped at this point as Bay Pacific did not pay.

*October 8, 1945* *P. Exhibit #42.*
Moore received $200 (Count 11), cash payment, on R. H. Hilken's contract providing for cost-plus arrangement, bank loan. It also provided that Hilken could name his sub-contractors. $1,800 was to be paid before plans for an addition to his present business would be drawn—to consist of hotel upstairs, barroom downstairs and drugstore adjoining. Moore told him they had a lumber mill in Garberville.

*October 10, 1945* *D. Exhibit #J.*
Better Business Bureau of Oakland wrote to Bay Pacific about the complaint of Mr. and Mrs. A. L. Lund who had gone ahead and bought the lot they desired for $1,250 when Walsh told them it was $1,800. (As mentioned, *supra,* Mr. Lund received a refund of $100.) The letter mentioned that representations were made about owning a tile plant, manufacturing Venetian Blinds.

 *Henderson.*
Henderson testified that this was the first time he knew of such representations being made by his salesmen.

*October 10, 1945* *D. Exhibit #Z-1.*
Hertel of Oakland Better Business Bureau wrote to Erb of State Contractors' License Bd. attaching a copy of the letter covering the Lund complaint.

 *Henderson.*
Henderson called Hertel to inquire why he forwarded the Lund complaint to Erb without waiting for an explanation. Henderson offered proof that the above-mentioned lot sold for $1,800.

*October 11, 1945* *D. Exhibit #K.*
Wm. Phillips, realtor, wrote to Henderson: "Mr. Michael
Walsh, employed by me as a salesman, contacted one Mr.
Howard, a salesman with the Home Company, who showed
him the lot, pricing the same at $1,800 . . ."

*October 12, 1945* *P. Exhibit #s 13, 14.*
Charles and Lillian Adams (Count 8) signed a cost-plus con-
tract with usual provision for bank loan and refund, and paid
$1,500 down.

*Lillian Adams.*
Moore described ceramic tile as the "baby or invention of an
architect in their employ," that the house would be finished by
Christmas, and that they had high class workmen who were
satisfied because of the splendid salaries they were receiving.

*October, 1945* *Clarence Vezey.*
Clarence Vezey, who had represented a labor organization
and who had dealt with labor-employees for Henderson, was
hired to take care of labor relations.

*October 17, 1945* *D. Exhibit #L.*
Mr. A. L. Lund cashed the check drawn by Henderson for
$100 dated October 15th.

*October 16, 1945* *D. Exhibit #Y.*
Inspector A. F. Rahlves sent an interoffice memo to L. F. Erbs:
"I had Mr. F. W. Henderson of The Bay Pacific Company in
the office this A.M., in a complaint filed by Mr. George Sims
. . . I took the matter up of Mrs. Marie Lund and there appears
to be no grounds for a complaint."

*October, 1945* *Jewett Ivey.*
Jewett Ivey called up an agency in Oakland and upon its
recommendation called off proposed subdividing of his Ala-
meda property by Bay Pacific Co.

*October 16, 1945* *P. Exhibit #s 80, 81.*
Harry and Virginia Howard signed a cost-plus contract to
have a house built on their lot at Lafayette and paid $500 to
be applied to the $1,500 down payment. (This was offered as
evidence of similar offense.)

*October 18, 1945* *D. Exhibit #N.*
A. J. Clancy, manager, Painting & Decorating Contractors
Ass'n. of Alameda County, wrote to The Bay Pacific Company
that the Better Business Bureau and the State Contractors'

License Board had called their attention to The Bay Pacific Company's practices and requested The Bay Pacific Company's resignation from the association because of their unethical practices.

*October, 1945* *Douglas Miller.*
Douglas Miller worked on plans for George Sims, Roddicks, and Swifts and completed same. He received a purchase order before drawing plans. He was paid for his August and September work.

*October 21, 1945* *P. Exhibit #56.*
Tracy Clark was given a copy of "Walls of Tomorrow" describing The Bay Pacific *Corporation* and stating: "In addition to its various lumber mills it also controls the manufacture of innumerable major items: artistic light fixtures, modern bathroom equipment, pottery adornments . . ."

*Henderson.*
Henderson testified that this was the first draft of the pamphlet to be used to sell the *Corporation*, starting October 15th. (Ads were already set up: *D. Ex. #G, R.T. 877.*)

*October 23, 1945* *P. Exhibit #44.*
Mr. Bass (Count 11) paid The Bay Pacific Co. $1,000. (Contract later surrendered.)

*A. L. Bass.*
Earlier in October, Bass had been told about the Ivey subdivision. Gamble told him they were able to secure lumber, had their own lumbermills, and had the ability of getting other building supplies.

*October 24, 1945* *P. Exhibit #43.*
R. H. Hilken (Count 11) paid the balance of $1,800 on his down payment of $2,000.

*October, 1945* *P. Exhibit #38.*
Henderson made out a check for $2,500 as a refund to Robert M. Wilson, postdated for October 27, 1945. It was stamped "Account closed."

*Robert Wilson.*
When Wilson received this check he gave back his contract. Moore told them that the company bought direct from manufacturers, that they had two carloads of bathroom supplies rolling, and that lumber would be forthcoming from their own mills in great volume.

*October 26, 1945* *D. Exhibit #Z-2.*
Hertel, for Better Business Bureau, wrote the State Division of Corporations about the complaints and refunds made and

stated: "We have been told that Henderson has used some of this money as a down payment on contracts for the purchase of certain lumber or their output, that he is anxious to sell stock under his permit to pay off dissatisfied customers who claim that they were induced to sign contracts through misrepresentation and to complete his contracts with the lumber mills."

*October 27, 1945* *P. Exhibit #21.*
Henderson gave Norman V. Hamstad a promissory note payable seven days after date in exchange for a postdated check previously given when he gave up his contract.
*Norman Hamstad.*
He never collected the $3,000 Henderson promised to pay. Moore had told Hamstad they had seasoned lumber, two carloads of plumbing goods, their own workmen, and that they would be in their house by Christmas.

*October 27, 1945* *Fred Linderman. P. Exhibit #60.*
Fred Linderman, part owner of a lumbermill at Weott, Humboldt County, wanted Henderson to reconstruct his mill which was burned June 1st, and signed a contract under which Henderson advanced $15,000 evidenced by a promissory note in exchange for a mortgage and lumber at current O.P.A. prices.

*October 29, 1945 ·* *P. Exhibit #s 32, 33, 34, 35.*
Everett L. Morgan gave a check for *$400* (Count 7) and Albert L. Morgan gave a check for $600, and their father, J. O. Morgan, gave a check for $500 as a down payment of $1,500 for a family home. The contract contains the usual bank loan provision.

*October 31, 1945* *D. Exhibit #Z-6.*
Better Business Bureau of Sacramento wrote to Oakland Bureau that they had received the Oakland Bureau's Bulletin entitled "Blue Sky Construction Co.," and wanted the name of the company.

*November 2, 1945* *D. Exhibit #Z-7.*
Hertel of the Oakland Bureau wrote the Sacramento Bureau that the bulletin referred to The Bay Pacific Co., giving the addresses of its three offices.

*November 2, 1945* *V. J. Aiuto. P. Exhibit #s 89, 90.*
Vincent and Josephine Aiuto (similar offense) paid $1,000 and signed a cost-plus contract stating that a parcel of land

will be purchased and bank loan obtained. Moore signed a receipt for $1,000. Moore told them that they were a big company with their own lumbermills, electricians and pipe men.

*November 3, 1945* *D. Exhibit #Z-3.*
Hertel of Better Business Bureau wrote Ralph E. Hoyt that Bay Pacific Co. "represents the first of what might be called 'a post-war racket.' "

*November 5, 1945* *D. Exhibit #Z-4.*
Ralph E. Hoyt answered Hertel by writing "I understand from your letter and the accompanying bulletin that it is your belief that Henderson is guilty of obtaining property by false pretenses. I would appreciate your furnishing me with the names and addresses of any persons who can furnish evidence concerning this matter."

*November 6, 1945* *P. Exhibit #82.*
Harry Howard (similar offense) paid $1,000 balance on the down payment of his contract.

*November 7, 1945* *D. Exhibit #Z-5.*
Hertel wrote Hoyt "with reference to The Bay Pacific . . . the Bunco Detail of the Oakland Police Department have complete information on the subject together with names of victims."

*November 15, 1945* *Douglas Miller.*
Miller completed Hilken and Hickman plans and sketches for Pearl, Barnes, Adams jobs.

*November, 1945* *P. Exhibit #17.*
The Roddicks received a check for $1,000 postdated for November 12, 1945, which was not paid.

*November, 1945* *P. Exhibit #45.*
Refund check dated November 13, 1945, for $1,000 to order of Alsedaise Ozelle Bass signed "F. W. Henderson," stamped "Refer to Maker."

 *A. O. Bass.*
Bass surrendered his contract when he received this check.

*November, 1945* *Henderson.*
Martin, who owned a half interest in the Weott mill—the subject of the agreement with Linderman—died. It was on Firestone's statement of Martin's ability that Henderson agreed to advance $15,000.

*November 19, 1945* *P. Exhibit #62.*
Henderson gave his promissory note for $1,000 with the balance of $1.50 per 1,000 board feet of lumber as consideration for the Weott mill.

*November, 1945 Barnes. P. Exhibit #s 8, 9, 10, 11, 12.*
Barnes received five postdated checks totaling $7,000 in return for the $7,000 he had paid. He was unable to cash any of the five checks.

*November, 1945* *P. Exhibit #26.*
Delylia Hickman (Count 6) paid $500 on her contract.

*November 21, 1945 G. J. Lund. P. Exhibit #46.*
Gustav Lund (Count 11) paid $1,000 to Bay Pacific after seeing a classified ad.

*November 21, 1945* *P. Exhibit #s 39, 40.*
Application for a building permit for Delylia Hickman accompanied by Henderson's check for $35 which the bank stamped "Account closed."

*November 21, 1945 Charles Kelso. P. Exhibit #88.*
Charles Kelso (similar offense) signed a contract providing for the completion of construction by April 1, 1946. He paid $500, none of which was refunded. Moore told him the company owned Claremont lots.

*November 23, 1945* *D. Exhibit #s H, I.*
Henderson procured two contracts for lumber, one with B. & O. Lumber Co., and the other with Jacklin & Wilson which provided "That upon the shipment of lumber . . . [Bay Pacific] shall, immediately upon receipt thereof, advance sufficient money to the second party for the further purchase of logs to replace those used in the manufacture of the lumber in said shipment."

*November 25, 1945* *P. Exhibit #22.*
A classified ad appeared in the Oakland Tribune: "Building —will design, build the home of your dreams on your lot; we furnish architectural plans, designs and assistance in obtaining lot. TEmplebar 7521."

*Late in November, 1945* *People's witnesses.*
Creditors' meeting was held at which Henderson told those who wanted refunds that some people were interested in putting him out of business. (Moore contends that he was not

present, but that he heard about the meeting and that this was the first time that he learned of the true financial condition of The Bay Pacific Co.)

*November 28, 1945* *P. Exhibit #87.*
Clarence Lee Dong induced John C. Tau (similar offense) to sign a contract for the purchase of a lot in the Claremont Heights property. Tau paid $2,100.

*December 3, 1945* *Joseph Kenney.*
Joseph Kenney discussed possibility of organizing construction.

*December 5, 1945* *P. Exhibit #62.*
Bay Pacific's note to Linderman was canceled.

*December 5, 1945* *D. Exhibit #S.*
Moore's contract with the Bay Pacific *Corporation* was drawn up. It provides "that no salary shall be paid . . . for his services hereunder, the total compensation for such services being the commissions . . . provided, however, that such commissions shall be finally determined upon the actual completion of each unit."

*December, 1945* *P. Exhibit #s 36, 37.*
Postdated checks were given as refunds to A. L. Morgan and Gustav Lund. These were not honored.

*December, 1945* *George Threlkeld. D. Exhibit #O.*
George Threlkeld drew plans for taking over construction of the houses under contract after determining that there was at least $22,725 uncollected profit in them.

*December 18, 1945* *D. Exhibit #Z-8.*
Hertel of Better Business Bureau wrote Deputy D. A. Arthur Sherry about another complaint against The Bay Pacific.

*January 3, 1946* *Joseph Kenney.*
Joseph Kenney's crew stopped work when the D. A. took over The Bay Pacific.

*January 9, 1946* *D. Exhibit #Z-9.*
Hertel received a letter from Contractors' License Board stating that a thorough investigation was being made in connection with Bay Pacific Corporation's application for a license.

There was considerable evidence introduced as to the hopeless financial condition of the company. It is quite apparent

that from the very first the company had insufficient capital, and that its financial condition grew steadily worse until the inevitable collapse.

### Sufficiency of the Evidence on Ten Grand Theft Counts as to Henderson.

█ A reading of the record demonstrates that Henderson directly and indirectly made numerous false statements to prospective customers to induce them to make contracts with The Bay Pacific Company. Some twenty prospective persons, including those named as the victims in the first ten counts of the indictment, testified as to these representations by which nearly $80,000 was secured from customers. Thus it was represented that The Bay Pacific Company had mills in the northern part of the state, and that all kinds of building materials were available through contracts and agencies that the defendants had with different plumbing, hardware and electrical dealers; that the company had an electrical agency; that the company made loans from banks in groups for its customers and thus got more favorable interest rates; that a particular type of tile had been invented by one of the employees, and the company had the right to its use; that the company had its own tile yard; that it had supplies of prewar plumbing materials; that the company owned land in Berkeley and Albany for its lumber yard and warehouse site; that the company had on hand enough lumber to start construction at once and that they had plenty of kiln-dried lumber at Garberville; that the company owned the Claremont Heights property and the Masonic Avenue property; that the company had carloads of plumbing material available; that the company was constructing one hundred houses. Various representations, all false, were made to various persons and organizations to the effect that the company was a responsible firm with substantial assets. The evidence shows that neither the company nor Henderson ever owned any property, and that it had no substantial financial resources. Henderson argues that the various representations were true. It is a fact that as to most of them some deal was pending by which Henderson hoped that the representation would come true. Thus the representation about owning lumber mills was based on the fact that deals were entered into with the Hobsons, Weott, Perry, Briceland and others in reference to the purchase of lumber and mills, but all these deals fell through.

According to the evidence Henderson represented he had presently available all the lumber he needed and his own mills, when he knew that no mills were in fact in operation and that his interests therein were contingent. The representation that he had facilities available to dry kiln the lumber was false. While some discussion had been had with Tidewater Company about securing their kilns, nothing was ever done about it. The representation that he had seasoned lumber to carry out the contracts was clearly an overstatement. The representations that he had his own lumber yards in Oakland and Albany were false. While he started to negotiate with the owners to buy, he never got title because of inability to make the down payments. Most of his representations about having plumbing materials presently available were false. The most that the evidence shows is that Henderson tried to negotiate the purchase of two carloads, but the deal never materialized. His representations that he had presently available all necessary electrical equipment was false. At most he had a deal with Dong to buy from Dong if and when Dong could get such appliances. The representation that he had lots on which to build was an overstatement. The most he had was an option to purchase. His representations that he maintained specialized crews of flooring men, electricians, plumbers and other craftsmen were overstatements. While he had some carpenters, painters and laborers in his employ he did not have any plumbing, electrical or flooring crews.

It is quite clear that if the evidence is considered, as we must consider it, in the strongest light in favor of the verdicts (*People* v. *Matthew,* 68 Cal.App. 95 [228 P. 417] ; *People* v. *Rankin,* 10 Cal.2d 198 [74 P.2d 71] ; *People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778] ; *People* v. *Kessler,* 62 Cal.App.2d 817 [145 P.2d 656] ; *People* v. *Buenaflore,* 40 Cal.App.2d 713 [105 P.2d 621]) it is ample to prove every element necessary to sustain the convictions on all ten counts of grand theft. The court fully instructed on the elements of the offenses charged. The jury was amply justified in its findings.

### Sufficiency of the Evidence on Ten Grand Theft Counts as to Moore.

There is merit in Moore's contention that as to his conviction under Counts 1, 3 and 7 of the indictment—the Swift, Roddick and Morgan counts—the evidence shows that he did not participate therein, the three transactions being handled

entirely by Henderson. ■ The State does not contend that the evidence shows that Moore participated in these three deals, but contents itself with the assertion that the case was tried on a conspiracy theory, and that the declarations of one conspirator made in furtherance of the conspiracy are binding on all conspirators, citing *People* v. *Cook,* 10 Cal. App.2d 54 [51 P.2d 169] and *People* v. *Suter,* 43 Cal.App.2d 444 [111 P.2d 23]. It is true, of course, that in a prosecution for conspiracy the declarations of one conspirator made in furtherance of the conspiracy are binding on all, but that does not mean that where specific offenses are also charged, that the State does not have to prove against each defendant all of the elements of each offense. Here, in the challenged counts, Moore was charged with the grand theft of specific amounts of money secured from Swift, Roddick and Everett Morgan on specific days. If Henderson had testified that Moore assisted him in these deals the cited cases might be in point, but the evidence fails to show directly or inferentially that Moore participated in the slightest degree in these offenses. The conspiracy charged in Count 11 is of no importance here because it charged as overt acts entirely different transactions. The convictions under the three counts must be reversed.

As to the other seven counts of grand theft, Moore vigorously contends that, although he made the various representations appearing in the record to the persons named in the various counts, and even if the representations were false, the evidence shows that he made them in good faith in reliance on information given him by Henderson and others in his employ and upon whom he had a right to rely. In other words, it is urged that there is no evidence as to the basic element of intent to defraud.

■ There can be no doubt that the record demonstrates that Moore was not nearly as morally reprehensible as was Henderson. On the other hand, Moore did make many false representations. In reliance on them the persons named in the seven counts under discussion parted with their money. Whether Moore made these representations in good faith or whether he made them knowing they were false, or in reckless disregard of the truth and without information justifying the belief, were questions for the jury. Intent cannot always be proved by direct evidence. Many times it has to be determined from a consideration of all the circumstances sur-

rounding the doing of an act. ■ Certainly the jury was justified in finding that one who was so closely connected with the company must have known that many of his representations were false. This being so, this court cannot disturb the verdicts. (*People* v. *Newland*, 15 Cal.2d 678 [104 P.2d 778]; *People* v. *Kessler*, 62 Cal.App.2d 817 [145 P.2d 656]; *People* v. *Jones*, 61 Cal.App.2d 608 [143 P.2d 726].) ■ An intention to defraud is an essential element of the charged offenses, but such intention is inferable from all the facts of the case and need not be substantively proved. (2 Wharton's Criminal Law, § 1450, p. 1739; Miller on Criminal Law, pp. 382-389; May's Criminal Law (3d ed.), pp. 299-312.)

### Sufficiency of the Evidence as to both appellants on the Conspiracy Count.

■ The essence of this charge is that Henderson and Moore conspired to defraud by making false promises with the fraudulent intent not to perform them. Once it is determined, as it already has been determined in connection with the grand theft counts, that both appellants in connection with the business of the company made the false representations charged, the fact that they acted in concert is proved by both direct and inferential evidence. What was said in *People* v. *Yant*, 26 Cal.App.2d 725, 737 [80 P.2d 506], is applicable to the present record: "It is not often that the direct fact of an unlawful agreement which is the essence of a conspiracy can be proved otherwise than by the establishment of independent facts bearing upon the common design; and the question as to the existence of the conspiracy being one of fact, it is sufficient if the circumstances proved satisfy the jury, leaving the weight and sufficiency of the evidence to the triers of the questions of fact." (See, also, *People* v. Sampsell, 104 Cal.App. 431 [286 P. 434]; *Johnstone* v. *Morris*, 210 Cal. 580 [292 P. 970]; *Revert* v. *Hesse*, 184 Cal. 295 [193 P. 943]; *Campbell* v. *Birch*, 19 Cal.2d 778 [122 P.2d 902]; *People* v. *Kauffman*, 152 Cal. 331 [92 P. 861].)

The real question presented is whether the false promises were made with the fraudulent intent not to perform them. Henderson urges that had he not been interfered with he would have fulfilled his basic promises. His argument amounts to the contention that the proof of his intent not to perform rests on circumstantial evidence, and he invokes the rule that such evidence will sustain a conviction only where the circumstances not only are consistent with guilt but are in-

consistent with every reasonable hypothesis of innocence. The jury was so instructed. So far as an appellate court is concerned, we think the evidence supports the implied finding of fraudulent intent, and, that being so, the contention now under consideration is without merit.

Moore vigorously contends that he was not even in the employ of the company on July 25, 1945, the date the conspiracy is alleged to have started. The evidence does show that he was in Oakland conferring with Henderson on July 23rd and 24th, 1945; that he then returned to Tacoma; that he came back to Oakland on August 7, 1945, and became sales-manager on August 26, 1945. Whether he actually started to conspire with Henderson on the 25th is immaterial. (*State of California* v. *Day,* 76 Cal.App.2d 536 [173 P.2d 399].) As long as there is active cooperation, the period when each defendant enters the conspiracy is immaterial. (2 Wharton's Criminal Law, § 1608, p. 1865.)

Moore, like Henderson, urges that there was no intent to defraud. What was said as to Henderson's like contention is equally applicable here. All of the problems presented as to the conspiracy count were jury questions. Its findings are supported and cannot be disturbed.

*Alleged errors of law.*

1. *Evidence of other offenses.*

During the trial the court admitted evidence of sales and representations to others than those mentioned in the indictment. Both appellants recognize the rule that evidence of other acts of a similar nature may be admitted, when not too remote, to prove a material fact or where they tend to show motive, scheme, plan or system. (*People* v. *Nakis,* 184 Cal. 105 [193 P. 92]; *People* v. *Kynette,* 15 Cal.2d 731 [104 P.2d 794]; *People* v. *Hatch,* 163 Cal. 368 [125 P. 907]; *People* v. *Hennessey,* 201 Cal. 568 [258 P. 49].) An examination of the record as to the sales made to Harry and Virginia Howard, George and Tena Gatliff, John Tau, Mary Lund, Charles Kelso, and Vincent Aiuto shows that they fall well within the realm of admissibility.

The facts in reference to these sales were introduced *seriatim.* Counsel for Henderson wanted to know if he had to object separately as to each one. The trial judge stated: "Maybe counsel will stipulate you will have these objections to similar offenses." There then followed a colloquy between Henderson's counsel, the court and the deputy district attor-

ney over the question, during which all of them used the expression "similar offenses," or described the transactions in question as "offenses" several times. Moore complains of this use of the word "offenses" and urges that declaring the testimony is a "similar offense" invades the province of the jury, that is, that it was for the jury to decide whether the transactions were offenses and whether they were similar offenses. This may be true, and the use of the term "offenses" was perhaps unfortunate, but it could not possibly have been prejudicial. The jury was fully, fairly and completely instructed on its proper functions and could not possibly have been misled by this challenged colloquy.

 Henderson complains of the introduction of many checks which were postdated and which were not paid by the banks on which they were drawn. The record shows that Henderson's counsel stipulated to the introduction of the various checks which were offered to establish the facts alleged in the indictment. The checks in the "similar offense" category were merely cumulative. The objection is without merit.

*2. Introduction of pamphlet, "Walls of Tomorrow."*

 Appellant Moore contends that error was committed in admitting into evidence this exhibit, a pamphlet describing the activities of the corporation. This pamphlet was introduced while Tracy Clark, who had been employed to sell real estate for the company, was on the stand. He testified that Henderson gave him the pamphlet in October, 1945, and told him that it "was the text of, or copy to be used in getting out some advertising . . . [for the] Bay Pacific Company's program." Moore urges that the document referred only to the activities of the corporation which never actively engaged in business, that it was never exhibited to prospective customers, and that it was a mere communication between employer and employee. It will be noted that Clark testified that the pamphlet was to be used as a text for advertising for the company as distinguished from the corporation. Moreover, it is a reasonable inference that Henderson expected Clark to read the document and to use its representations in his selling campaign. At any rate, the admission of this document could not possibly have been prejudicial. The representations contained therein, although couched in quite flowery language, had been testified to by a host of witnesses. At most it was merely cumulative.

*Alleged coercion by the Court.*

█ The jury consisted of ten women and two men. The case had taken almost three weeks to try. The jury commenced its deliberations at 11:45 a. m. At 4:47 p. m. of the same day the jury returned to the courtroom and requested that a certain portion of the transcript be read. After this was done the trial judge told the jury that: "This case has taken a long time to try, and if you don't reach a verdict, say, by 9:30 or 10:00 o'clock tonight, I plan to lock you up. So, as soon as it becomes apparent that you are not going to reach a verdict on all counts tonight, by that time, say, will you let us know so we can dispatch some deputies around to your various homes to get the things you will need." The jury returned with its verdicts at 5:58 p. m. Appellant Moore urges that the necessary effect of this statement by the court was to coerce the jury into reaching a verdict. In this connection he relies on the affidavits of two jurors, one who was by stipulation excused after this statement was made because she stated she was ill, and counsel stipulated the alternate could be substituted, and one by one of the jurors, who avers that she heard one of the women jurors state that she did not want to stay overnight and wanted to go home. The sick juror averred, in effect, that she declared she was ill because she wanted to go home. Aside from the elementary rule of law that a juror is not permitted in this fashion to impeach his verdict it is quite obvious that what the trial judge said was not said for the purpose of coercion, but was said for the purpose of serving the convenience of the jury. Here was a case where about 2,000 pages of evidence were introduced. There were eleven counts against each defendant. Obviously, had the jury not agreed prior to 9:00 or 10:00 p. m. it would have been most proper to hold them overnight to see if agreement could not be reached. But with twelve jurors and several alternates this would mean sending a bailiff or deputy sheriff to quite a number of homes to notify relatives and to secure articles for the convenience of the jurors. The trial judge is to be commended rather than reproved for his consideration.

*Alleged misconduct of District Attorney.*

█ Henderson charges that the district attorney was guilty of misconduct in several respects. He first complains of a reference by the deputy district attorney to the possibility as to whether a debenture issued by Henderson as con-

sideration for the Hobson contract violated the Corporate Securities Act. The record shows not only that Henderson's counsel failed to object or request that the statement be stricken, but that the statement was made in direct response to a question of Henderson's counsel directed to the prosecutor. While it would have been improper to have charged Henderson on this trial with a violation of the Corporate Securities Act, here the error of which he complains was not only invited but specifically requested by Henderson's counsel. Moreover, the debenture in question was made part of the record upon the consent of Henderson's counsel. Under such circumstances Henderson is in no legal position to complain. (*People* v. *Page*, 28 Cal.App.2d 642 [83 P.2d 77]; *People* v. *Ralls*, 21 Cal.App.2d 674 [70 P.2d 265].)

Henderson also objects to certain questions asked him on cross-examination which indicated he had failed to pay certain federal payroll taxes, and had been in difficulties with the Internal Revenue Department. An examination of the record discloses that this subject was directly inquired into by Henderson's counsel on direct examination. Where the defendant opens a subject on direct examination, it may be examined into on cross-examination, and defendant has no legal ground for complaint, particularly where, as here, he has failed to object to the questions asked on cross-examination. (*People* v. *Brown*, 71 Cal.App. 181 [235 P. 72]; *People* v. *Medalgi*, 94 Cal.App. 543 [271 P. 552].)

### Alleged misconduct of the jury.

On the motion for new trial affidavits and counteraffidavits were filed by several of the jurors, the alternates, and one by the attorney for appellants. Of the affidavits relied upon by appellants only one is of a juror who participated in the final determination of the case—that of Anita George. The affidavits of Lee B. Kidwell and of Mrs. Minnie Taylor show that although they were originally selected as jurors they were later excused and alternates selected in their places. As to these affidavits, at least as to matters not occurring while they were regular jurors, and as to the affidavit of the attorney, they do not fall within the rule that jurors cannot, by affidavit, impeach their verdict, except to show that such verdict was reached by lot. (*People* v. *Galloway*, 202 Cal. 81 [259 P. 332].)

The appellants assert that the affidavits show misconduct on the part of the jury in four respects:

1. It is alleged that the jury received evidence out of court. The affidavit of Mrs. Taylor avers that she heard juror Sheinberg state and argue that Henderson had "defrauded people in the East of a lot of money and would defraud other people if they weren't convicted." There is no evidence in the record of this asserted fact. Penal Code, section 1181, subdivision 2, provides that a new trial may be granted when the jury has received evidence out of court. The affidavit of the juror Sheinberg generally denies the facts averred by Mrs. Taylor. This conflict was for the trier of the facts.

2. It is urged the jury failed to follow the court's instructions. Again the Taylor affidavit is relied upon. It is there averred that during the discussions in the jury room no effort was made to discuss the guilt or innocence of Moore and Henderson separately as the court had instructed. It is also averred that during the trial the affiant and jurors George, James and Kelly rode together and were heard by Taylor to state that they favored the prosecution from the beginning. The court had, of course, instructed the jurors not to discuss the case during recess. These charges are generally denied by the juror Kelly. Inasmuch as Mrs. Taylor was excused before the verdicts were reached, she could not know what happened after she left. As to the alleged prejudice it is specifically denied by the juror Kelly. General discussion of the jurors during recess, while not to be approved, could not, as a matter of law, be prejudicial.

3. The jurors prejudged the case before the evidence was in. The affidavits of Kidwell and Taylor are particularly aimed, in this respect, at the juror Jurs. They aver that while these two affiants were still members of the jury, the juror Jurs opened a discussion with each of the affiants and indicated that he was convinced of the guilt of the appellants. This charge is specifically denied by the juror Jurs, and is generally denied in the affidavits of several of the other jurors. This conflict was for the trier of the fact.

4. That one of the jurors was coerced and intimidated. This is perhaps the most serious charge made. Its charge relates to the circumstances under which the juror Taylor was excused as a juror. The facts relied upon appear in the affidavit of Taylor and are corroborated by the juror George. It appears in these affidavits that Mrs. Taylor was regularly

selected as a juror and participated as such all through the trial, and retired with the jurors to deliberate on the verdicts; that she alone of the jurors was in favor of acquittals for both appellants; that she remained adamant in this position, whereupon several of the jurors became very excited and sought to coerce and intimidate her by charging her with perjury on her *voir dire* examination; by accusing her of being friends of the appellants, etc. The record shows that the jury came into court and it was reported to the judge that Mrs. Taylor was too ill to continue the deliberations, whereupon the judge carefully interrogated her. He told her that if she just did not feel like assuming the responsibilities of a juror she could not be excused, but that she could if she were really ill. Mrs. Taylor replied that she was sick and might ''pass out'' at any time. She was excused. The affidavits of nearly all of the jurors, with the exception of the George affidavit, aver that no coercion or intimidation was practiced on Mrs. Taylor, and aver that she represented she was too ill to continue. This conflict was for the trier of the facts.

In connection with all of these charges appellants urge that their affidavits were properly filed, and sustain the charges of misconduct, citing *People* v. *Galloway*, 202 Cal. 81 [259 P. 332]. In that case certain affidavits alleging misconduct on the part of the jury were offered in support of the motion for a new trial, but, on objection of the district attorney, the trial court struck from the affidavits certain statements alleged to have been made by a juror prior to being sworn and other statements alleged to have been made subsequent to the rendition of the verdict. As one of several grounds of reversal the Supreme Court held that this was error, and that the trial court should have considered all affidavits of jurors as to statements made before and after the trial. But the court did not hold that because such affidavits should have been considered that the trial court was compelled to believe them, even if controverted. Here the affidavits were all filed and considered by the trial court, and, after argument, the trial court denied the motions for new trials. ▮ It is elementary law that the decision of the trial court in denying a motion for a new trial after considering conflicting affidavits is final in the absence of a showing of abuse of discretion—in fact, one of the cases cited by appellants so holds—*People* v. *Von Badenthal*, 8

Cal.App.2d 404 [48 P.2d 82]. (See, also, *People* v. *Negra,* 208 Cal. 64 [280 P. 354]; *People* v. *Ross,* 89 Cal.App. 132 [264 P. 314]; *People* v. *Maggio,* 90 Cal.App. 683 [266 P. 813]; *People* v. *Sotelo,* 102 Cal.App. 688 [283 P. 388].) Thus, even if the affidavits of Taylor and Kidwell were properly considered as to facts occurring while they were jurors (a point we do not decide) since they were filed and considered and controverted, the finding of the trial court cannot be disturbed.

The judgment and order denying the new trial as to Henderson are affirmed; the judgment and order denying the new trial as to appellant Moore are reversed as to Counts 1, 3 and 7, but as to the other eight counts are affirmed.

Ward, J., and Bray, J., concurred.

A petition for a rehearing was denied April 29, 1947, and appellant Jack Moore's petition for a hearing by the Supreme Court was denied May 12, 1947.